## WASHINGTON, MAYOR OF WASHINGTON, D. C., ET AL. *v.* DAVIS ET AL.

No. 74–1492.  Argued March 1, 1976—Decided June 7, 1976

230

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined, and in Parts I and II of which STEWART, J., joined. STEVENS, J., filed a concurring opinion, *post*, p. 252. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 256.

*David P. Sutton* argued the cause for petitioners. With him on the briefs were *C. Francis Murphy, Louis P. Robbins,* and *Richard W. Barton.*

*Richard B. Sobol* argued the cause for respondents Harley et al. With him on the briefs were *George Cooper, Richard T. Seymour, Marian Wright Edelman, Michael B. Trister,* and *Ralph J. Temple. Mark L. Evans* argued the cause for the Commissioners of the United States Civil Service Commission as respondents under this Court's Rule 21 (4). With him on the brief were *Solicitor General Bork, Assistant Attorney General Lee, Ronald R. Glancz,* and *Harry R. Silver.**

---

*\*R. Lawrence Ashe, Jr.,* and *Susan A. Cahoon* filed a brief for the Executive Committee of the Division of Industrial-Organizational Psychology (Div. 14) of the American Psychological Assn. as *amicus curiae* urging reversal.

*Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston,*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case involves the validity of a qualifying test administered to applicants for positions as police officers in the District of Columbia Metropolitan Police Department. The test was sustained by the District Court but invalidated by the Court of Appeals. We are in agreement with the District Court and hence reverse the judgment of the Court of Appeals.

I

This action began on April 10, 1970, when two Negro police officers filed suit against the then Commissioner of the District of Columbia, the Chief of the District's Metropolitan Police Department, and the Commissioners of the United States Civil Service Commission.[1] An amended complaint, filed December 10, alleged that the promotion policies of the Department were racially discriminatory and sought a declaratory judgment and an injunction. The respondents Harley and Sellers were permitted to intervene, their amended complaint assert-

---

*Barry L. Goldstein, Deborah M. Greenberg, Eric Schnapper,* and *O. Peter Sherwood* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Thaddeus Holt* for the American Society for Personnel Administration; and by *Howard P. Willens, Deanne C. Siemer,* and *John S. Kramer* for the Educational Testing Service.

[1] Under § 4–103 of the District of Columbia Code, appointments to the Metropolitan Police force were to be made by the Commissioner subject to the provisions of Title 5 of the United States Code relating to the classified civil service. The District of Columbia Council and the Office of Commissioner of the District of Columbia, established by Reorganization Plan No. 37 of 1967, were abolished as of January 2, 1975, and replaced by the Council of the District of Columbia and the Office of Mayor of the District of Columbia.

ing that their applications to become officers in the Department had been rejected, and that the Department's recruiting procedures discriminated on the basis of race against black applicants by a series of practices including, but not limited to, a written personnel test which excluded a disproportionately high number of Negro applicants. These practices were asserted to violate respondents' rights "under the due process clause of the Fifth Amendment to the United States Constitution, under 42 U. S. C. § 1981 and under D. C. Code § 1–320." [2] Defendants answered, and discovery and

---

[2] Title 42 U. S. C. § 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Section 1–320 of the District of Columbia Code (1973) provides:

"In any program of recruitment or hiring of individuals to fill positions in the government of the District of Columbia, no officer or employee of the government of the District of Columbia shall exclude or give preference to the residents of the District of Columbia or any State of the United States on the basis of residence, religion, race, color, or national origin."

One of the provisions expressly made applicable to the Metropolitan Police force by § 4–103 is 5 U. S. C. § 3304 (a), which provides:

"§ 3304. Competitive service; examinations.

"(a) The President may prescribe rules which shall provide, as nearly as conditions of good administration warrant, for—

"(1) open, competitive examinations for testing applicants for appointment in the competitive service which are practical in character and as far as possible relate to matters that fairly test the relative capacity and fitness of the applicants for the appointment sought; and

"(2) noncompetitive examinations when competent applicants do

various other proceedings followed.[3]   Respondents then
filed a motion for partial summary judgment with re-
spect to the recruiting phase of the case, seeking a dec-
laration that the test administered to those applying to
become police officers is "unlawfully discriminatory and
thereby in violation of the due process clause of the
Fifth Amendment . . . ."   No issue under any statute
or regulation was raised by the motion.   The District of
Columbia defendants, petitioners here, and the federal
parties also filed motions for summary judgment with
respect to the recruiting aspects of the case, asserting
that respondents were entitled to relief on neither con-
stitutional nor statutory grounds.[4]   The District Court
granted petitioners' and denied respondents' motions.
348 F. Supp. 15 (DC 1972).

According to the findings and conclusions of the Dis-
trict Court, to be accepted by the Department and to
enter an intensive 17-week training program, the police
recruit was required to satisfy certain physical and
character standards, to be a high school graduate or its
equivalent, and to receive a grade of at least 40 out of 80
on "Test 21," which is "an examination that is used gen-
erally throughout the federal service," which "was devel-
oped by the Civil Service Commission, not the Police De-

---

not compete after notice has been given of the existence of the
vacancy."

The complaint asserted no claim under § 3304.

[3] Those proceedings included a hearing on respondents' motion
for an order designating the case as a class action.   A ruling on
the motion was held in abeyance and was never granted insofar as
the record before us reveals.

[4] In support of the motion, petitioners and the federal parties
urged that they were in compliance with all applicable constitutional,
statutory, and regulatory provisions, including the provisions of the
Civil Service Act which since 1883 were said to have established
a "job relatedness" standard for employment.

partment," and which was "designed to test verbal ability, vocabulary, reading and comprehension." *Id.*, at 16.

The validity of Test 21 was the sole issue before the court on the motions for summary judgment. The District Court noted that there was no claim of "an intentional discrimination or purposeful discriminatory acts" but only a claim that Test 21 bore no relationship to job performance and "has a highly discriminatory impact in screening out black candidates." *Ibid.* Respondents' evidence, the District Court said, warranted three conclusions: "(a) The number of black police officers, while substantial, is not proportionate to the population mix of the city. (b) A higher percentage of blacks fail the Test than whites. (c) The Test has not been validated to establish its reliability for measuring subsequent job performance." *Ibid.* This showing was deemed sufficient to shift the burden of proof to the defendants in the action, petitioners here; but the court nevertheless concluded that on the undisputed facts respondents were not entitled to relief. The District Court relied on several factors. Since August 1969, 44% of new police force recruits had been black; that figure also represented the proportion of blacks on the total force and was roughly equivalent to 20- to 29-year-old blacks in the 50-mile radius in which the recruiting efforts of the Police Department had been concentrated. It was undisputed that the Department had systematically and affirmatively sought to enroll black officers many of whom passed the test but failed to report for duty. The District Court rejected the assertion that Test 21 was culturally slanted to favor whites and was "satisfied that the undisputable facts prove the test to be reasonably and directly related to the requirements of the police recruit training program and that it is neither so designed nor operates [*sic*] to discriminate

against otherwise qualified blacks." *Id.,* at 17. It was thus not necessary to show that Test 21 was not only a useful indicator of training school performance but had also been validated in terms of job performance— "The lack of job performance validation does not defeat the Test, given its direct relationship to recruiting and the valid part it plays in this process." *Ibid.* The District Court ultimately concluded that "[t]he proof is wholly lacking that a police officer qualifies on the color of his skin rather than ability" and that the Department "should not be required on this showing to lower standards or to abandon efforts to achieve excellence." [5] *Id.,* at 18.

Having lost on both constitutional and statutory issues in the District Court, respondents brought the case to the Court of Appeals claiming that their summary judgment motion, which rested on purely constitutional grounds, should have been granted. The tendered constitutional issue was whether the use of Test 21 invidiously discriminated against Negroes and hence denied them due process of law contrary to the commands of the Fifth Amendment. The Court of Appeals, addressing that issue, announced that it would be guided by *Griggs* v. *Duke Power Co.,* 401 U. S. 424 (1971), a case involving the interpretation and application of Title VII of the Civil Rights Act of 1964, and held that the statutory standards elucidated in that case were to govern the due process question tendered in this one.[6]   168 U. S. App. D. C. 42,

---

[5] When summary judgment was granted, the case with respect to discriminatory promotions was still pending. The District Court, however, made the determination and direction authorized by Fed. Rule Civ. Proc. 54 (b). The promotion issue was subsequently decided adversely to the original plaintiffs. *Davis* v. *Washington,* 352 F. Supp. 187 (DC 1972).

[6] "Although appellants' complaint did not allege a violation of Title VII of the Civil Rights Act of 1964, which then was inappli-

512 F. 2d 956 (1975). The court went on to declare that lack of discriminatory intent in designing and administering Test 21 was irrelevant; the critical fact was rather that a far greater proportion of blacks— four times as many—failed the test than did whites. This disproportionate impact, standing alone and without regard to whether it indicated a discriminatory purpose, was held sufficient to establish a constitutional violation, absent proof by petitioners that the test was an adequate measure of job performance in addition to being an indicator of probable success in the training program, a burden which the court ruled petitioners had failed to discharge. That the Department had made substantial efforts to recruit blacks was held beside the point and the fact that the racial distribution of recent hirings and of the Department itself might be roughly equivalent to the racial makeup of the surrounding community, broadly conceived, was put aside as a "comparison [not] material to this appeal." *Id.*, at 46 n. 24, 512 F. 2d, at 960 n. 24. The Court of Appeals, over a dissent, accordingly reversed the judgment of the District Court and directed that respondents' motion for partial summary judgment be granted. We granted the petition for certiorari, 423 U. S. 820 (1975), filed by the District of Columbia officials.[7]

cable to the Federal Government, decisions applying Title VII furnish additional instruction as to the legal standard governing the issues raised in this case . . . . The many decisions disposing of employment discrimination claims on constitutional grounds have made no distinction between the constitutional standard and the statutory standard under Title VII." 168 U. S. App. D. C. 42, 44 n. 2, 512 F. 2d 956, 958 n. 2 (1975).

[7] The Civil Service Commissioners, defendants in the District Court, did not petition for writ of certiorari but have filed a brief as respondents. See our Rule 21 (4). We shall at times refer to them as the "federal parties."

## II

Because the Court of Appeals erroneously applied the legal standards applicable to Title VII cases in resolving the constitutional issue before it, we reverse its judgment in respondents' favor. Although the petition for certiorari did not present this ground for reversal,[8] our Rule 40 (1)(d)(2) provides that we "may notice a plain error not presented"; [9] and this is an appropriate occasion to invoke the Rule.

As the Court of Appeals understood Title VII,[10] employees or applicants proceeding under it need not concern themselves with the employer's possibly discriminatory purpose but instead may focus solely on the racially differential impact of the challenged hiring or promotion

---

[8] Apparently not disputing the applicability of the *Griggs* and Title VII standards in resolving this case, petitioners presented issues going only to whether *Griggs* v. *Duke Power Co.,* 401 U. S. 424 (1971), had been misapplied by the Court of Appeals.

[9] See, *e. g., Silber* v. *United States,* 370 U. S. 717 (1962); *Carpenters* v. *United States,* 330 U. S. 395, 412 (1947); *Sibbach* v. *Wilson & Co.,* 312 U. S. 1, 16 (1941); *Mahler* v. *Eby,* 264 U. S. 32, 45 (1924); *Weems* v. *United States,* 217 U. S. 349, 362 (1910).

[10] Although Title VII standards have dominated this case, the statute was not applicable to federal employees when the complaint was filed; and although the 1972 amendments extending the Title to reach Government employees were adopted prior to the District Court's judgment, the complaint was not amended to state a claim under that Title, nor did the case thereafter proceed as a Title VII case. Respondents' motion for partial summary judgment, filed after the 1972 amendments, rested solely on constitutional grounds; and the Court of Appeals ruled that the motion should have been granted.

At the oral argument before this Court, when respondents' counsel was asked whether "this is just a purely Title VII case as it comes to us from the Court of Appeals without any constitutional overtones," counsel responded: "My trouble honestly with that proposition is the procedural requirements to get into court under Title VII, and this case has not met them." Tr. of Oral Arg. 66.

practices. This is not the constitutional rule. We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today.

The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. *Bolling* v. *Sharpe,* 347 U. S. 497 (1954). But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact.

Almost 100 years ago, *Strauder* v. *West Virginia,* 100 U. S. 303 (1880), established that the exclusion of Negroes from grand and petit juries in criminal proceedings violated the Equal Protection Clause, but the fact that a particular jury or a series of juries does not statistically reflect the racial composition of the community does not in itself make out an invidious discrimination forbidden by the Clause. "A purpose to discriminate must be present which may be proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination." *Akins* v. *Texas,* 325 U. S. 398, 403–404 (1945). A defendant in a criminal case is entitled "to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the administration of justice." *Alexander* v. *Louisiana,* 405 U. S. 625, 628–629 (1972). See also *Carter* v. *Jury Comm'n,* 396 U. S. 320, 335–

337, 339 (1970); *Cassell* v. *Texas,* 339 U. S. 282, 287–290 (1950); *Patton* v. *Mississippi,* 332 U. S. 463, 468–469 (1947).

The rule is the same in other contexts. *Wright* v. *Rockefeller,* 376 U. S. 52 (1964), upheld a New York congressional apportionment statute against claims that district lines had been racially gerrymandered. The challenged districts were made up predominantly of whites or of minority races, and their boundaries were irregularly drawn. The challengers did not prevail because they failed to prove that the New York Legislature "was either motivated by racial considerations or in fact drew the districts on racial lines"; the plaintiffs had not shown that the statute "was the product of a state contrivance to segregate on the basis of race or place of origin." *Id.,* at 56, 58. The dissenters were in agreement that the issue was whether the "boundaries . . . were purposefully drawn on racial lines." *Id.,* at 67.

The school desegregation cases have also adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause. The essential element of *de jure* segregation is "a current condition of segregation resulting from intentional state action." *Keyes* v. *School Dist. No. 1,* 413 U. S. 189, 205 (1973). "The differentiating factor between *de jure* segregation and so-called *de facto* segregation . . . is *purpose* or *intent* to segregate." *Id.,* at 208. See also *id.,* at 199, 211, 213. The Court has also recently rejected allegations of racial discrimination based solely on the statistically disproportionate racial impact of various provisions of the Social Security Act because "[t]he acceptance of appel-

lants' constitutional theory would render suspect each difference in treatment among the grant classes, however lacking in racial motivation and however otherwise rational the treatment might be." *Jefferson* v. *Hackney,* 406 U. S. 535, 548 (1972). And compare *Hunter* v. *Erickson,* 393 U. S. 385 (1969), with *James* v. *Valtierra,* 402 U. S. 137 (1971).

This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law's disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race. *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886). It is also clear from the cases dealing with racial discrimination in the selection of juries that the systematic exclusion of Negroes is itself such an "unequal application of the law . . . as to show intentional discrimination." *Akins* v. *Texas, supra,* at 404. *Smith* v. *Texas,* 311 U. S. 128 (1940); *Pierre* v. *Louisiana,* 306 U. S. 354 (1939); *Neal* v. *Delaware,* 103 U. S. 370 (1881). A prima facie case of discriminatory purpose may be proved as well by the absence of Negroes on a particular jury combined with the failure of the jury commissioners to be informed of eligible Negro jurors in a community, *Hill* v. *Texas,* 316 U. S. 400, 404 (1942), or with racially non-neutral selection procedures, *Alexander* v. *Louisiana, supra; Avery* v. *Georgia,* 345 U. S. 559 (1953); *Whitus* v. *Georgia,* 385 U. S. 545 (1967). With a prima facie case made out, "the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Alexander, supra,* at 632. See also *Turner* v. *Fouche,* 396 U. S. 346, 361 (1970); *Eubanks* v. *Louisiana,* 356 U. S. 584, 587 (1958).

Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact—in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires—may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, *McLaughlin* v. *Florida,* 379 U. S. 184 (1964), that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.

There are some indications to the contrary in our cases. In *Palmer* v. *Thompson,* 403 U. S. 217 (1971), the city of Jackson, Miss., following a court decree to this effect, desegregated all of its public facilities save five swimming pools which had been operated by the city and which, following the decree, were closed by ordinance pursuant to a determination by the city council that closure was necessary to preserve peace and order and that integrated pools could not be economically operated. Accepting the finding that the pools were closed to avoid violence and economic loss, this Court rejected the argument that the abandonment of this service was inconsistent with the outstanding desegregation decree and that the otherwise seemingly permissible ends served by the ordinance could be impeached by demonstrating that

racially invidious motivations had prompted the city council's action. The holding was that the city was not overtly or covertly operating segregated pools and was extending identical treatment to both whites and Negroes. The opinion warned against grounding decision on legislative purpose or motivation, thereby lending support for the proposition that the operative effect of the law rather than its purpose is the paramount factor. But the holding of the case was that the legitimate purposes of the ordinance—to preserve peace and avoid deficits—were not open to impeachment by evidence that the councilmen were actually motivated by racial considerations. Whatever dicta the opinion may contain, the decision did not involve, much less invalidate, a statute or ordinance having neutral purposes but disproportionate racial consequences.

*Wright* v. *Council of City of Emporia,* 407 U. S. 451 (1972), also indicates that in proper circumstances, the racial impact of a law, rather than its discriminatory purpose, is the critical factor. That case involved the division of a school district. The issue was whether the division was consistent with an outstanding order of a federal court to desegregate the dual school system found to have existed in the area. The constitutional predicate for the District Court's invalidation of the divided district was "the enforcement until 1969 of racial segregation in a public school system of which Emporia had always been a part." *Id.,* at 459. There was thus no need to find "an independent constitutional violation." *Ibid.* Citing *Palmer* v. *Thompson,* we agreed with the District Court that the division of the district had the effect of interfering with the federal decree and should be set aside.

That neither *Palmer* nor *Wright* was understood to have changed the prevailing rule is apparent from *Keyes* v. *School Dist. No. 1, supra,* where the principal issue

in litigation was whether and to what extent there had been purposeful discrimination resulting in a partially or wholly segregated school system. Nor did other later cases, *Alexander* v. *Louisiana, supra,* and *Jefferson* v. *Hackney, supra,* indicate that either *Palmer* or *Wright* had worked a fundamental change in equal protection law.[11]

Both before and after *Palmer* v. *Thompson,* however, various Courts of Appeals have held in several contexts, including public employment, that the substantially disproportionate racial impact of a statute or official practice standing alone and without regard to discriminatory purpose, suffices to prove racial discrimination violating the Equal Protection Clause absent some justification going substantially beyond what would be necessary to validate most other legislative classifications.[12] The

---

[11] To the extent that *Palmer* suggests a generally applicable proposition that legislative purpose is irrelevant in constitutional adjudication, our prior cases—as indicated in the text—are to the contrary; and very shortly after *Palmer,* all Members of the Court majority in that case joined the Court's opinion in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), which dealt with the issue of public financing for private schools and which announced, as the Court had several times before, that the validity of public aid to church-related schools includes close inquiry into the purpose of the challenged statute.

[12] Cases dealing with public employment include: *Chance* v. *Board of Examiners,* 458 F. 2d 1167, 1176–1177 (CA2 1972); *Castro* v. *Beecher,* 459 F. 2d 725, 732–733 (CA1 1972); *Bridgeport Guardians* v. *Bridgeport Civil Service Comm'n,* 482 F. 2d 1333, 1337 (CA2 1973); *Harper* v. *Mayor of Baltimore,* 359 F. Supp. 1187, 1200 (Md.), aff'd in pertinent part *sub nom. Harper* v. *Kloster,* 486 F. 2d 1134 (CA4 1973); *Douglas* v. *Hampton,* 168 U. S. App. D. C. 62, 67, 512 F. 2d 976, 981 (1975); but cf. *Tyler* v. *Vickery,* 517 F. 2d 1089, 1096–1097 (CA5 1975), cert. pending, No. 75–1026. There are also District Court cases: *Wade* v. *Mississippi Cooperative Extension Serv.,* 372 F. Supp. 126, 143 (ND Miss. 1974); *Arnold* v. *Ballard,* 390 F. Supp. 723, 736, 737 (ND Ohio 1975);

cases impressively demonstrate that there is another side
to the issue; but, with all due respect, to the extent that
those cases rested on or expressed the view that proof
of discriminatory racial purpose is unnecessary in making
out an equal protection violation, we are in disagreement.

As an initial matter, we have difficulty understanding
how a law establishing a racially neutral qualification
for employment is nevertheless racially discriminatory and
denies "any person . . . equal protection of the laws" sim-
ply because a greater proportion of Negroes fail to
qualify than members of other racial or ethnic groups.
Had respondents, along with all others who had failed
Test 21, whether white or black, brought an action
claiming that the test denied each of them equal protec-
tion of the laws as compared with those who had passed
with high enough scores to qualify them as police recruits,
it is most unlikely that their challenge would have been
sustained.   Test 21, which is administered generally to
prospective Government employees, concededly seeks to
ascertain whether those who take it have acquired a
particular level of verbal skill; and it is untenable that

---

*United States* v. *City of Chicago,* 385 F. Supp. 543, 553 (ND Ill.
1974); *Fowler* v. *Schwarzwalder,* 351 F. Supp. 721, 724 (Minn.
1972), rev'd on other grounds, 498 F. 2d 143 (CA8 1974).

In other contexts there are *Norwalk CORE* v. *Norwalk Redevel-
opment Agency,* 395 F. 2d 920 (CA2 1968) (urban renewal); *Ken-
nedy Park Homes Assn.* v. *City of Lackawanna,* 436 F. 2d 108, 114
(CA2 1970), cert. denied, 401 U. S. 1010 (1971) (zoning); *Southern
Alameda Spanish Speaking Organization* v. *Union City,* 424 F. 2d 291
(CA9 1970) (dictum) (zoning); *Metropolitan H. D. Corp.* v. *Vil-
lage of Arlington Heights,* 517 F. 2d 409 (CA7), cert. granted, 423
U. S. 1030 (1975) (zoning); *Gautreaux* v. *Romney,* 448 F. 2d 731,
738 (CA7 1971) (dictum) (public housing); *Crow* v. *Brown,* 332
F. Supp. 382, 391 (ND Ga. 1971), aff'd, 457 F. 2d 788 (CA5 1972)
(public housing); *Hawkins* v. *Town of Shaw,* 437 F. 2d 1286 (CA5
1971), aff'd on rehearing en banc, 461 F. 2d 1171 (1972) (munici-
pal services).

the Constitution prevents the Government from seeking modestly to upgrade the communicative abilities of its employees rather than to be satisfied with some lower level of competence, particularly where the job requires special ability to communicate orally and in writing. Respondents, as Negroes, could no more successfully claim that the test denied them equal protection than could white applicants who also failed. The conclusion would not be different in the face of proof that more Negroes than whites had been disqualified by Test 21. That other Negroes also failed to score well would, alone, not demonstrate that respondents individually were being denied equal protection of the laws by the application of an otherwise valid qualifying test being administered to prospective police recruits.

Nor on the facts of the case before us would the disproportionate impact of Test 21 warrant the conclusion that it is a purposeful device to discriminate against Negroes and hence an infringement of the constitutional rights of respondents as well as other black applicants. As we have said, the test is neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue. Even agreeing with the District Court that the differential racial effect of Test 21 called for further inquiry, we think the District Court correctly held that the affirmative efforts of the Metropolitan Police Department to recruit black officers, the changing racial composition of the recruit classes and of the force in general, and the relationship of the test to the training program negated any inference that the Department discriminated on the basis of race or that "a police officer qualifies on the color of his skin rather than ability." 348 F. Supp., at 18.

Under Title VII, Congress provided that when hiring

and promotion practices disqualifying substantially disproportionate numbers of blacks are challenged, discriminatory purpose need not be proved, and that it is an insufficient response to demonstrate some rational basis for the challenged practices. It is necessary, in addition, that they be "validated" in terms of job performance in any one of several ways, perhaps by ascertaining the minimum skill, ability, or potential necessary for the position at issue and determining whether the qualifying tests are appropriate for the selection of qualified applicants for the job in question.[13] However this process proceeds, it involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the Constitution where special racial impact, without discriminatory purpose, is claimed. We are not disposed to adopt this more rigorous standard for the purposes

---

[13] It appears beyond doubt by now that there is no single method for appropriately validating employment tests for their relationship to job performance. Professional standards developed by the American Psychological Association in its Standards for Educational and Psychological Tests and Manuals (1966), accept three basic methods of validation: "empirical" or "criterion" validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified); "construct" validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and "content" validity (demonstrated by tests whose content closely approximates tasks to be performed on the job by the applicant). These standards have been relied upon by the Equal Employment Opportunity Commission in fashioning its Guidelines on Employee Selection Procedures, 29 CFR pt. 1607 (1975), and have been judicially noted in cases where validation of employment tests has been in issue. See, e. g., Albemarle Paper Co. v. Moody, 422 U. S. 405, 431 (1975); Douglas v. Hampton, 168 U. S. App. D. C., at 70, 512 F. 2d, at 984; Vulcan Society v. Civil Service Comm'n, 490 F. 2d 387, 394 (CA2 1973).

of applying the Fifth and the Fourteenth Amendments in cases such as this.

A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white.[14]

Given that rule, such consequences would perhaps be likely to follow. However, in our view, extension of the rule beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription.

As we have indicated, it was error to direct summary judgment for respondents based on the Fifth Amendment.

### III

We also hold that the Court of Appeals should have affirmed the judgment of the District Court granting the motions for summary judgment filed by petitioners and the federal parties. Respondents were entitled to relief on neither constitutional nor statutory grounds.

---

[14] Goodman, De Facto School Segregation: A Constitutional and Empirical Analysis, 60 Calif. L. Rev. 275, 300 (1972), suggests that disproportionate-impact analysis might invalidate "tests and qualifications for voting, draft deferment, public employment, jury service, and other government-conferred benefits and opportunities . . . ; [s]ales taxes, bail schedules, utility rates, bridge tolls, license fees, and other state-imposed charges." It has also been argued that minimum wage and usury laws as well as professional licensing requirements would require major modifications in light of the unequal-impact rule. Silverman, Equal Protection, Economic Legislation, and Racial Discrimination, 25 Vand. L. Rev. 1183 (1972). See also Demsetz, Minorities in the Market Place, 43 N. C. L. Rev. 271 (1965).

The submission of the defendants in the District Court was that Test 21 complied with all applicable statutory as well as constitutional requirements; and they appear not to have disputed that under the statutes and regulations governing their conduct standards similar to those obtaining under Title VII had to be satisfied.[15] The District Court also assumed that Title VII standards were to control the case, identified the determinative issue as whether Test 21 was sufficiently job related and proceeded to uphold use of the test because it was "directly related to a determination of whether the applicant possesses sufficient skills requisite to the demands of the curriculum a recruit must master at the police academy." 348 F. Supp., at 17. The Court of Appeals reversed because the relationship between Test 21 and training school success, if demonstrated at all, did not satisfy what it deemed to be the crucial requirement

---

[15] In their memorandum supporting their motion for summary judgment, the federal parties argued:

"In *Griggs, supra,* the Supreme Court set a job-relationship standard for the private sector employers which has been a standard for federal employment since the passage of the Civil Service Act in 1883. In that act Congress has mandated that the federal government must use '. . . examinations for testing applicants for appointment . . . which . . . as far as possible relate to matters that fairly test the relative capacity and fitness of the applicants for the appointments sought.' 5 U. S. C. § 3304 (a)(1). Defendants contend that they have been following the job-related standards of *Griggs, supra,* for the past eighty-eight years by virtue of the enactment of the Civil Service Act which guaranteed open and fair competition for jobs."

They went on to argue that the *Griggs* standard had been satisfied. In granting the motions for summary judgment filed by petitioners and the federal parties, the District Court necessarily decided adversely to respondents the statutory issues expressly or tacitly tendered by the parties.

of a direct relationship between performance on Test 21 and performance on the policeman's job.

We agree with petitioners and the federal parties that this was error. The advisability of the police recruit training course informing the recruit about his upcoming job, acquainting him with its demands, and attempting to impart a modicum of required skills seems conceded. It is also apparent to us, as it was to the District Judge, that some minimum verbal and communicative skill would be very useful, if not essential, to satisfactory progress in the training regimen. Based on the evidence before him, the District Judge concluded that Test 21 was directly related to the requirements of the police training program and that a positive relationship between the test and training-course performance was sufficient to validate the former, wholly aside from its possible relationship to actual performance as a police officer. This conclusion of the District Judge that training-program validation may itself be sufficient is supported by regulations of the Civil Service Commission, by the opinion evidence placed before the District Judge, and by the current views of the Civil Service Commissioners who were parties to the case.[16] Nor is the

---

[16] See n. 17, *infra.* Current instructions of the Civil Service Commission on "Examining, Testing, Standards, and Employment Practices" provide in pertinent part:

"S2–2—Use of applicant appraisal procedures

"a. *Policy.* The Commission's staff develops and uses applicant appraisal procedures to assess the knowledges, skills, and abilities of persons for jobs and not persons in the abstract.

"(1) Appraisal procedures are designed to reflect real, reasonable, and necessary qualifications for effective job behavior.

"(2) An appraisal procedure must, among other requirements, have a demonstrable and rational relationship to important job-related performance objectives identified by management, such as:

"(a) Effective job performance;

conclusion foreclosed by either *Griggs* or *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405 (1975); and it seems to us the much more sensible construction of the job-relatedness requirement.

The District Court's accompanying conclusion that Test 21 was in fact directly related to the requirements of the police training program was supported by a validation study, as well as by other evidence of record;[17]

---

"(b) Capability;

"(c) Success in training;

"(d) Reduced turnover; or

"(e) Job satisfaction." 37 Fed. Reg. 21557 (1972).

See also Equal Employment Opportunity Commission Guidelines on Employee Selection Procedures, 29 CFR § 1607.5 (b)(3) (1975), discussed in *Albemarle Paper Co.* v. *Moody,* 422 U. S., at 430–435.

[17] The record includes a validation study of Test 21's relationship to performance in the recruit training program. The study was made by D. L. Futransky of the Standards Division, Bureau of Policies and Standards, United States Civil Service Commission. App. 99–109. Findings of the study included data "support[ing] the conclusion that T[est] 21 is effective in selecting trainees who can learn the material that is taught at the Recruit School." *Id.,* at 103. Opinion evidence, submitted by qualified experts examining the Futransky study and/or conducting their own research, affirmed the correlation between scores on Test 21 and success in the training program. *E. g.,* Affidavit of Dr. Donald J. Schwartz (personnel research psychologist, United States Civil Service Commission), App. 178, 183 ("It is my opinion . . . that Test 21 has a significant positive correlation with success in the MPD Recruit School for both Blacks and whites and is therefore shown to be job related . . ."); affidavit of Diane E. Wilson (personnel research psychologist, United States Civil Service Commission), App. 185, 186 ("It is my opinion that there is a direct and rational relationship between the content and difficulty of Test 21 and successful completion of recruit school training").

The Court of Appeals was "willing to assume for purposes of this appeal that appellees have shown that Test 21 is predictive of fur-

and we are not convinced that this conclusion was erroneous.

The federal parties, whose views have somewhat changed since the decision of the Court of Appeals and who still insist that training-program validation is sufficient, now urge a remand to the District Court for the purpose of further inquiry into whether the training-program test scores, which were found to correlate with Test 21 scores, are themselves an appropriate measure of the trainee's mastership of the material taught in the course and whether the training program itself is sufficiently related to actual performance of the police officer's task. We think a remand is inappropriate. The District Court's judgment was warranted by the record before it, and we perceive no good reason to reopen it, particularly since we were informed at oral argument that although Test 21 is still being administered, the training program itself has undergone substantial modification in the course of this litigation. If there are now deficiencies in the recruiting practices under prevailing Title VII standards, those deficiencies are to be directly addressed in accordance with appropriate procedures mandated under that Title.

The judgment of the Court of Appeals accordingly is reversed.

*So ordered.*

MR. JUSTICE STEWART joins Parts I and II of the Court's opinion.

MR. JUSTICE STEVENS, concurring.

While I agree with the Court's disposition of this case, I add these comments on the constitutional issue dis-

---

ther progress in Recruit School." 168 U. S. App. D. C., at 48, 512 F. 2d, at 962.

cussed in Part II and the statutory issue discussed in Part III of the Court's opinion.

The requirement of purposeful discrimination is a common thread running through the cases summarized in Part II. These cases include criminal convictions which were set aside because blacks were excluded from the grand jury, a reapportionment case in which political boundaries were obviously influenced to some extent by racial considerations, a school desegregation case, and a case involving the unequal administration of an ordinance purporting to prohibit the operation of laundries in frame buildings. Although it may be proper to use the same language to describe the constitutional claim in each of these contexts, the burden of proving a prima facie case may well involve differing evidentiary considerations. The extent of deference that one pays to the trial court's determination of the factual issue, and indeed, the extent to which one characterizes the intent issue as a question of fact or a question of law, will vary in different contexts.

Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it.

My point in making this observation is to suggest that the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume. I agree, of course, that a constitutional issue does not arise every time some disproportionate impact is shown. On the other hand, when the disproportion is as dramatic as in *Gomillion* v. *Lightfoot,* 364 U. S. 339, or *Yick Wo* v. *Hopkins,* 118 U. S. 356, it really does not matter whether the standard is phrased in terms of purpose or effect. Therefore, although I accept the statement of the general rule in the Court's opinion, I am not yet prepared to indicate how that standard should be applied in the many cases which have formulated the governing standard in different language.*

My agreement with the conclusion reached in Part II of the Court's opinion rests on a ground narrower than the Court describes. I do not rely at all on the evidence of good-faith efforts to recruit black police officers. In my judgment, neither those efforts nor the subjective good faith of the District administration, would save Test 21 if it were otherwise invalid.

There are two reasons why I am convinced that the challenge to Test 21 is insufficient. First, the test serves the neutral and legitimate purpose of requiring all applicants to meet a uniform minimum standard of literacy. Reading ability is manifestly relevant to the police function, there is no evidence that the required passing grade was set at an arbitrarily high level, and there is sufficient disparity among high schools and high school graduates to justify the use of a separate uniform test. Second,

---

*Specifically, I express no opinion on the merits of the cases listed in n. 12 of the Court's opinion.

the same test is used throughout the federal service. The applicants for employment in the District of Columbia Police Department represent such a small fraction of the total number of persons who have taken the test that their experience is of minimal probative value in assessing the neutrality of the test itself. That evidence, without more, is not sufficient to overcome the presumption that a test which is this widely used by the Federal Government is in fact neutral in its effect as well as its "purpose" as that term is used in constitutional adjudication.

My study of the statutory issue leads me to the same conclusion reached by the Court in Part III of its opinion. Since the Court of Appeals set aside the portion of the District Court's summary judgment granting the defendants' motion, I agree that we cannot ignore the statutory claims even though, as the Court makes clear, *ante*, at 238 n. 10, there is no Title VII question in this case. The actual statutory holdings are limited to 42 U. S. C. § 1981 and § 1–320 of the District of Columbia Code, to which regulations of the Equal Employment Opportunity Commission have no direct application.

The parties argued the case as though Title VII standards were applicable. In a general way those standards shed light on the issues, but there is sufficient individuality and complexity to that statute, and to the regulations promulgated under it, to make it inappropriate simply to transplant those standards in their entirety into a different statutory scheme having a different history. Moreover, the subject matter of this case—the validity of qualifications for the law enforcement profession—is one in which federal district judges have a greater expertise than in many others. I therefore do not regard this as a case in which the District Court was required to apply Title VII standards as strictly as would

be necessary either in other contexts or in litigation actually arising under that statute.

The Court's specific holding on the job-relatedness question contains, I believe, two components. First, as a matter of law, it is permissible for the police department to use a test for the purpose of predicting ability to master a training program even if the test does not otherwise predict ability to perform on the job. I regard this as a reasonable proposition and not inconsistent with the Court's prior holdings, although some of its prior language obviously did not contemplate this precise problem. Second, as a matter of fact, the District Court's finding that there was a correlation between success on the test and success in the training program has sufficient evidentiary support to withstand attack under the "clearly erroneous" standard mandated by Fed. Rule Civ. Proc. 52 (a). Whether or not we would have made the same finding of fact, the opinion evidence identified in n. 17 of the Court's opinion—and indeed the assumption made by the Court of Appeals quoted therein—is surely adequate to support the finding under the proper standard of appellate review.

On the understanding that nothing which I have said is inconsistent with the Court's reasoning, I join the opinion of the Court except to the extent that it expresses an opinion on the merits of the cases cited *ante,* at 244–245, n. 12.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

The Court holds that the job qualification examination (Test 21) given by the District of Columbia Metropolitan Police Department does not unlawfully discriminate on the basis of race under either constitutional or statutory standards.

Initially, it seems to me that the Court should not pass on the statutory questions, because they are not presented by this case. The Court says that respondents' summary judgment motion "rested on purely constitutional grounds," *ante,* at 236, and that "the Court of Appeals erroneously applied the legal standards applicable to Title VII cases in resolving the constitutional issue before it," *ante,* at 238. There is a suggestion, however, that petitioners are entitled to prevail because they met the burden of proof imposed by 5 U. S. C. § 3304. *Ante,* at 249 n. 15. As I understand the opinion, the Court therefore holds that Test 21 is job related under § 3304, but not necessarily under Title VII. But that provision, by the Court's own analysis, is no more in the case than Title VII; respondents' "complaint asserted no claim under § 3304." *Ante,* at 234 n. 2. Cf. *ante,* at 238 n. 10. If it was "plain error" for the Court of Appeals to apply a statutory standard to this case, as the Court asserts, *ante,* at 238–239, then it is unfortunate that the Court does not recognize that it is also plain error to address the statutory issues in Part III of its opinion.

Nevertheless, although it appears unnecessary to reach the statutory questions, I will accept the Court's conclusion that respondents were entitled to summary judgment if they were correct in their statutory arguments, and I would affirm the Court of Appeals because petitioners have failed to prove that Test 21 satisfies the applicable statutory standards.[1] All parties' arguments and

---

[1] Although I do not intend to address the constitutional questions considered by the Court in Part II of its opinion, I feel constrained to comment upon the propriety of footnote 12, *ante,* at 244–245. One of the cases "disapproved" therein is presently scheduled for plenary consideration by the Court in the 1976 Term, *Metropolitan*

both lower court decisions were based on Title VII standards. In this context, I think it wrong to focus on § 3304 to the exclusion of the Title VII standards, particularly because the Civil Service Commission views the job-relatedness standards of Title VII and § 3304 as identical.[2] See also *infra,* at 263.

In applying a Title VII test,[3] both the District Court and the Court of Appeals held that respondents had offered sufficient evidence of discriminatory impact to shift to petitioners the burden of proving job relatedness. 348 F. Supp. 15, 16; 168 U. S. App. D. C. 42, 45–47, 512 F. 2d 956, 959–961. The Court does not question these rulings, and the only issue before us is what petitioners were required to show and whether they carried their burden. The Court agrees with the District Court's conclusion that Test 21 was validated by a positive relationship between Test 21 scores and performance in police training courses. This result is based upon the Court's reading of the record, its interpretation of in-

---

*Housing Development Corp.* v. *Village of Arlington Heights,* 517 F. 2d 409 (CA7), cert. granted, 423 U. S. 1030 (1975). If the Court regarded this case only a few months ago as worthy of full briefing and argument, it ought not be effectively reversed merely by its inclusion in a laundry list of lower court decisions.

[2] The only administrative authority relied on by the Court in support of its result is a regulation of the Civil Service Commission construing the civil service employment standards in Title 5 of the United States Code. *Ante,* at 250–251, n. 16. I note, however, that 5 U. S. C. § 3304 was brought into this case by the CSC, not by respondents, and the CSC's only reason for referring to that provision was to establish that petitioners had been "following the job-related standards of *Griggs* [v. *Duke Power Co.,* 401 U. S. 424 (1971),] for the past eighty-eight years." *Ante,* at 249 n. 15.

[3] The provision in Title VII on which petitioners place principal reliance is 42 U. S. C. § 2000e–2 (h). See *Griggs* v. *Duke Power Co., supra,* at 433–436.

structions governing testing practices issued by the Civil Service Commission (CSC), and "the current views of the Civil Service Commissioners who were parties to the case." We are also assured that today's result is not foreclosed by *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), and *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405 (1975). Finally, the Court asserts that its conclusion is "the much more sensible construction of the job-relatedness requirement." *Ante,* at 251.

But the CSC instructions cited by the Court do not support the District Court's conclusion. More importantly, the brief filed in this Court by the CSC takes the position that petitioners did not satisfy the burden of proof imposed by the CSC guidelines. It also appears that longstanding regulations of the Equal Employment Opportunity Commission (EEOC)—previously endorsed by this Court—require a result contrary to that reached by the Court. Furthermore, the Court's conclusion is inconsistent with my understanding of the interpretation of Title VII in *Griggs* and *Albemarle.* I do not find this conclusion "much more sensible," and with all respect I suggest that today's decision has the potential of significantly weakening statutory safeguards against discrimination in employment.

I

On October 12, 1972, the CSC issued a supplement to the Federal Personnel Manual containing instructions for compliance with its general regulations concerning employment practices.[4] The provision cited by the Court

---

[4] See 5 CFR § 300.101 *et seq.* (1976). These instructions contain the "regulations" that the Court finds supportive of the District Court's conclusion, which was reached under Title VII, but neither the instructions nor the general regulations are an interpretation of

requires that Test 21 "have a demonstrable and rational relationship to important job-related performance objectives identified by management." "Success in training" is one example of a possible objective. The statistical correlation established by the Futransky validity study, *ante,* at 251 n. 17, was between applicants' scores on Test 21 and recruits' average scores on final examinations given during the police training course.

It is hornbook law that the Court accord deference to the construction of an administrative regulation when that construction is made by the administrative authority responsible for the regulation. *E. g., Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). It is worthy of note, therefore, that the brief filed by the CSC in this case interprets the instructions in a manner directly contrary to the Court, despite the Court's claim that its result is supported by the Commissioners' "current views."

> "Under Civil Service Commission regulations and current professional standards governing criterion-related test validation procedures, the job-relatedness of an entrance examination may be demonstrated by proof that scores on the examination predict properly measured success in job-relevant training (regardless of whether they predict success on the job itself).
>
> "The documentary evidence submitted in the district court demonstrates that scores on Test 21 are predictive of Recruit School Final Averages. There

---

Title VII. The instructions were issued "under authority of sections 3301 and 3302 of title 5, United States Code, and E. O. 10577, 3 CFR 1954–58 Comp., p. 218." 37 Fed. Reg. 21552 (1972). The pertinent regulations of the CSC in 5 CFR § 300.101 *et seq.* were promulgated pursuant to the same authorities, as well as 5 U. S. C. §§ 7151, 7154 and Exec. Order No. 11478, 3 CFR 803 (1966–1970 Comp.).

is little evidence, however, concerning the relationship between the Recruit School tests and the substance of the training program, and between the substance of the training program and the post-training job of a police officer. *It cannot be determined, therefore, whether the Recruit School Final Averages are a proper measure of success in training and whether the training program is job-relevant.* Brief for CSC 14–15 (emphasis added).

The CSC maintains that a positive correlation between scores on entrance examinations and the criterion of success in training may establish the job relatedness of an entrance test—thus relieving an employer from the burden of providing a relationship to job performance after training—but only subject to certain limitations.

"Proof that scores on an entrance examination predict scores on training school achievement tests, however, does not, by itself, satisfy the burden of demonstrating the job-relatedness of the entrance examination. There must also be evidence—the nature of which will depend on the particular circumstances of the case—showing that the achievement test scores are an appropriate measure of the trainee's mastery of the material taught in the training program and that the training program imparts to a new employee knowledge, skills, or abilities required for performance of the post-training job." *Id.,* at 24–25.

Applying its standards [5] the CSC concludes that none of

---

[5] The CSC asserts that certain of its guidelines have some bearing on Test 21's job relatedness. Under the CSC instructions, " 'criterion-related' validity," see *Douglas* v. *Hampton,* 168 U. S. App. D. C. 62, 70 n. 60, 512 F. 2d 976, 984 n. 60 (1975), can be established by

the evidence presented in the District Court established "the appropriateness of using Recruit School Final Averages as the measure of training performance or the relationship of the Recruit School program to the job of a police officer." *Id.*, at 30.[6]

The CSC's standards thus recognize that Test 21 can be validated by a correlation between Test 21 scores and recruits' averages on training examinations only if (1) the training averages predict job performance or (2) the averages are proved to measure performance in job-related training. There is no proof that the recruits' average is correlated with job performance after completion of training. See n. 10, *infra*. And although a positive relationship to the recruits' average might be sufficient to validate Test 21 if the average were proved to reflect mastery of material on the training curriculum that was in turn demonstrated to be relevant to job performance, the record is devoid of proof in this regard. First, there is no demonstration by petitioners that the training-course examinations measure comprehension of the training curriculum; indeed, these examinations do not even appear in the record. Furthermore, the Futransky study simply designated an average of 85 on the

demonstrating a correlation between entrance examination scores and "a criterion which is legitimately based on the needs of the Federal Government." ¶ S3–2 (a)(2), 37 Fed. Reg. 21558 (1972). Further, to prove validity, statistical studies must demonstrate that Test 21, "to a significant degree, measures performance or qualifications requirements which are relevant to the job or jobs for which candidates are being evaluated." ¶ S3–3 (a), 37 Fed. Reg. 21558 (1972). These provisions are ignored in the Court's opinion.

[6] On this basis, the CSC argues that the case ought to be remanded to enable petitioners to try to make such a demonstration, but this resolution seems to me inappropriate. Both lower courts recognized that petitioners had the burden of proof, and as this burden is yet unsatisfied, respondents are entitled to prevail.

examination as a "good" performance and assumed that a recruit with such an average learned the material taught in the training course.[7] Without any further proof of the significance of a score of 85, and there is none in the record, I cannot agree that Test 21 is predictive of "success in training."

## II

Today's decision is also at odds with EEOC regulations issued pursuant to explicit authorization in Title VII. 42 U. S. C. § 2000e–12 (a). Although the dispute in this case is not within the EEOC's jurisdiction, as I noted above, the proper construction of Title VII nevertheless is relevant. Moreover, the 1972 extension of Title VII to public employees gave the same substantive protection to those employees as had previously been accorded in the private sector, *Morton* v. *Mancari,* 417 U. S. 535, 546–547 (1974), and it is therefore improper to maintain different standards in the public and private sectors. *Chandler* v. *Roudebush,* 425 U. S. 840, 864 (1976). See n. 2, *supra.*

As with an agency's regulations, the construction of a statute by the agency charged with its administration is entitled to great deference. *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205, 210 (1972); *Udall* v. *Tallman,* 380 U. S., at 16; *Power Reactor Co.* v. *Electricians,* 367 U. S. 396, 408 (1961). The defer-

---

[7] The finding in the Futransky study on which the Court relies, *ante,* at 251 n. 17, was that Test 21 "is effective in selecting trainees who can learn the material that is taught at the Recruit School," because it predicts averages over 85. On its face, this would appear to be an important finding, but the fact is that *everyone* learns the material included in the training course. The study noted that all recruits pass the training examinations; if a particular recruit has any difficulty, he is given assistance until he passes.

ence due the pertinent EEOC regulations is enhanced by the fact that they were neither altered nor disapproved when Congress extensively amended Title VII in 1972.[8] *Chemehuevi Tribe of Indians* v. *FPC*, 420 U. S. 395, 410 (1975); *Cammarano* v. *United States,* 358 U. S. 498, 510 (1959); *Allen* v. *Grand Central Aircraft Co.,* 347 U. S. 535, 547 (1954); *Massachusetts Mut. Life Ins. Co.* v. *United States,* 288 U. S. 269, 273 (1933). These principles were followed in *Albemarle*—where the Court explicitly endorsed various regulations no fewer than eight times in its opinion, 422 U. S., at 431–436 [9]—and *Griggs,* 401 U. S., at 433–434.

The EEOC regulations require that the validity of a job qualification test be proved by "empirical data demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." 29 CFR § 1607.4 (c) (1975). This construction of Title VII was approved in *Albemarle,* where we quoted this provision and remarked that "[t]he message of these Guidelines is the same as that of the *Griggs* case." 422 U. S., at 431. The regulations also set forth minimum standards for

---

[8] Still another factor mandates deference to the EEOC regulations. The House and Senate committees considering the 1972 amendments to Title VII recognized that discrimination in employment, including the use of testing devices, is a "complex and pervasive phenomenon." S. Rep. No. 92–415, p. 5 (1971); H. R. Rep. No. 92–238, p. 8 (1971). As a result, both committees noted the need to obtain "expert assistance" in this area. S. Rep. No. 92–415, *supra,* at 5; H. R. Rep. No. 92–238, *supra,* at 8.

[9] Indeed, two Justices asserted that the Court relied too heavily on the EEOC guidelines. 422 U. S., at 449 (BLACKMUN, J., concurring in judgment); *id.,* at 451 (BURGER, C. J., concurring in part and dissenting in part).

validation and delineate the criteria that may be used for this purpose.

"The work behaviors or other criteria of employee adequacy which the test is intended to predict or identify must be fully described; and, additionally, in the case of rating techniques, the appraisal form(s) and instructions to the rater(s) must be included as a part of the validation evidence. Such criteria may include measures other than actual work proficiency, such as training time, supervisory ratings, regularity of attendance and tenure. Whatever criteria are used they must represent major or critical work behaviors as revealed by careful job analyses." 29 CFR § 1607.5 (b)(3) (1975).

This provision was also approved in *Albemarle*. 422 U. S., at 432, and n. 30.

If we measure the validity of Test 21 by this standard, which I submit we are bound to do, petitioners' proof is deficient in a number of ways similar to those noted above. First, the criterion of final training examination averages does not appear to be "fully described." Although the record contains some general discussion of the training curriculum, the examinations are not in the record, and there is no other evidence completely elucidating the subject matter tested by the training examinations. Without this required description we cannot determine whether the correlation with training examination averages is sufficiently related to petitioners' need to ascertain "job-specific ability." See *Albemarle,* 422 U. S., at 433. Second, the EEOC regulations do not expressly permit validation by correlation to training performance, unlike the CSC instructions. Among the specified criteria the closest to training performance is "training time." All recruits to the Metropolitan Police Department, however, go through the

same training course in the same amount of time, including those who experience some difficulty. See n. 7, *supra.* Third, the final requirement of § 1607.5 (b)(3) has not been met. There has been no job analysis establishing the significance of scores on training examinations, nor is there any other type of evidence showing that these scores are of "major or critical" importance.

Accordingly, EEOC regulations that have previously been approved by the Court set forth a construction of Title VII that is distinctly opposed to today's statutory result.

## III

The Court also says that its conclusion is not foreclosed by *Griggs* and *Albemarle,* but today's result plainly conflicts with those cases. *Griggs* held that "[i]f an employment practice which operates to exclude Negroes cannot be shown to be *related to job performance,* the practice is prohibited." 401 U. S., at 431 (emphasis added). Once a discriminatory impact is shown, the employer carries the burden of proving that the challenged practice "bear[s] a *demonstrable relationship to successful performance of the jobs* for which it was used." *Ibid.* (emphasis added). We observed further:

> "Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. . . . What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract." *Id.,* at 436.

*Albemarle* read *Griggs* to require that a discriminatory test be validated through proof "by professionally acceptable methods" that it is " 'predictive of or signifi-

cantly correlated with *important* elements of work behavior *which comprise or are relevant to the job or jobs for which candidates are being evaluated.'* " 422 U. S., at 431 (emphasis added), quoting 29 CFR § 1607.4(c) (1975). Further, we rejected the employer's attempt to validate a written test by proving that it was related to supervisors' job performance ratings, because there was no demonstration that the ratings accurately reflected job performance. We were unable "to determine whether the criteria *actually* considered were sufficiently related to the [employer's] legitimate interest in job-specific ability to justify a testing system with a racially discriminatory impact." 422 U. S., at 433 (emphasis in original). To me, therefore, these cases read Title VII as requiring proof of a significant relationship to job performance to establish the validity of a discriminatory test. See also *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802, and n. 14 (1973). Petitioners do not maintain that there is a demonstrated correlation between Test 21 scores and job performance. Moreover, their validity study was unable to discern a significant positive relationship between training averages and job performance.[10] Thus, there is no proof of a correlation—either direct or indirect—between Test 21 and performance of the job of being a police officer.

It may well be that in some circumstances, proof of a relationship between a discriminatory qualification test and training performance is an acceptable substitute for establishing a relationship to job performance. But this question is not settled, and it should not be re-

---

[10] Although the validity study found that Test 21 predicted job performance for white officers, but see *Albemarle,* 422 U. S., at 433, no similar relationship existed for black officers. The same finding was made as to the relationship between training examination averages and job performance. See *id.,* at 435.

solved by the minimal analysis in the Court's opinion.[11] Moreover, it is particularly inappropriate to decide the question on this record. "Professionally acceptable methods" apparently recognize validation by proof of a correlation with training performance, rather than job performance, if (1) the training curriculum includes information proved to be important to job performance and (2) the standard used as a measure of training performance is shown to reflect the trainees' mastery of the material included in the training curriculum. See Brief for CSC 24–29; Brief for the Executive Committee of Division 14 of the American Psychological Assn. as *Amicus Curiae* 37–43. But no authority, whether professional, administrative, or judicial, has accepted the sufficiency of a correlation with training performance in the absence of such proof. For reasons that I have stated above, the record does not adequately establish either factor. As a result, the Court's conclusion cannot be squared with the focus on job performance in *Griggs* and *Albemarle,* even if this substitute showing is reconcilable with the holdings in those cases.

Today's reduced emphasis on a relationship to job performance is also inconsistent with clearly expressed congressional intent. A section-by-section analysis of the 1972 amendments to Title VII states as follows:

"In any area where the new law does not address itself, or in any areas where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would

---

[11] The Court of Appeals recognized that deciding whether 42 U. S. C. § 2000e–2 (h) permitted such proof "is not a simple or insignificant endeavor." 168 U. S. App. D. C. 42, 50 n. 59, 512 F. 2d 956, 964 n. 59. The court declined to express any view on this issue on the ground that petitioners had not satisfied this standard even if it were acceptable, which seems to me the proper treatment of the question.

continue to govern the applicability and construction of Title VII." 118 Cong. Rec. 7166 (1972).

The pre-1972 judicial decisions dealing with standardized tests used as job qualification requirements uniformly follow the EEOC regulations discussed above and insist upon proof of a relationship to job performance to prove that a test is job related.[12] Furthermore, the Court ignores Congress' explicit hostility toward the use of written tests as job-qualification requirements; Congress disapproved the CSC's "use of general ability tests which are not aimed at any direct relationship to specific jobs." H. R. Rep. No. 92–238, p. 24 (1971). See S. Rep. No. 92–415, pp. 14–15 (1971). Petitioners concede that Test 21 was devised by the CSC for general use and was not designed to be used by police departments.

Finally, it should be observed that every federal court, except the District Court in this case, presented with proof identical to that offered to validate Test 21 has reached a conclusion directly opposite to that of the

---

[12] *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971); *United States* v. *Jacksonville Terminal Co.*, 451 F. 2d 418, 456–457 (CA5 1971), cert. denied, 406 U. S. 906 (1972); *Hicks* v. *Crown Zellerbach Corp.*, 319 F. Supp. 314, 319–321 (ED La. 1970) (issuing preliminary injunction), 321 F. Supp. 1241, 1244 (1971) (issuing permanent injunction). See also *Castro* v. *Beecher*, 334 F. Supp. 930 (Mass. 1971), aff'd in part and rev'd in part on other grounds, 459 F. 2d 725 (CA1 1972); *Western Addition Community Org.* v. *Alioto*, 330 F. Supp. 536, 539–540 (ND Cal. 1971), 340 F. Supp. 1351, 1354–1356 (1972) (issuing preliminary injunction), 360 F. Supp. 733 (1973) (issuing permanent injunction); *Chance* v. *Board of Examiners*, 330 F. Supp. 203 (SDNY 1971), aff'd, 458 F. 2d 1167 (CA2 1972); *Baker* v. *Columbus Mun. Sep. School Dist.*, 329 F. Supp. 706, 721–722 (ND Miss. 1971), aff'd, 462 F. 2d 1112 (CA5 1972); *Arrington* v. *Massachusetts Bay Transp. Auth.*, 306 F. Supp. 1355 (Mass. 1969).

Court today.[13]  Sound policy considerations support the view that, at a minimum, petitioners should have been required to prove that the police training examinations either measure job-related skills or predict job performance.  Where employers try to validate written qualification tests by proving a correlation with written examinations in a training course, there is a substantial danger that people who have good verbal skills will achieve high scores on both tests due to verbal ability, rather than "job-specific ability."  As a result, employers could validate any entrance examination that measures only verbal ability by giving another written test that measures verbal ability at the end of a training course.  Any contention that the resulting correlation between examination scores would be evidence that the initial test is "job related" is plainly erroneous.  It seems to me, however, that the Court's holding in this case can be read as endorsing this dubious proposition.  Today's result will prove particularly unfortunate if it is extended to govern Title VII cases.

Accordingly, accepting the Court's assertion that it is necessary to reach the statutory issue, I would hold that petitioners have not met their burden of proof and affirm the judgment of the Court of Appeals.

---

[13] *United States* v. *City of Chicago,* 385 F. Supp. 543, 555–556 (ND Ill. 1974) (police department); *Officers for Justice* v. *CSC,* 371 F. Supp. 1328, 1337 (ND Cal. 1973) (police department); *Smith* v. *City of East Cleveland,* 363 F. Supp. 1131, 1148–1149 (ND Ohio 1973) (police department), aff'd in part and rev'd in part on other grounds, 520 F. 2d 492 (CA6 1975); *Harper* v. *Mayor of Baltimore,* 359 F. Supp. 1187, 1202–1203 (Md.) (fire department), modified and aff'd, 486 F. 2d 1134 (CA4 1973); *Pennsylvania* v. *O'Neill,* 348 F. Supp. 1084, 1090–1091 (ED Pa. 1972) (police department), aff'd in pertinent part and vacated in part, 473 F. 2d 1029 (CA3 1973).