Anthony T. LEE et al., Plaintiffs,

John A. Bland, Luvenia Thomas and Samuel T. Gantt, Plaintiff-Intervenors,

v.

CONECUH COUNTY BOARD OF EDUCATION et al., Defendants.

Civ. A. No. 5945–79–H.

United States District Court, S. D. Alabama, S. D.

Jan. 30, 1979.

Donald V. Watkins, Montgomery, Ala., for plaintiff-intervenors.

Robert G. Kendall, Mobile, Ala., J. B. Nix, Jr., Evergreen, Ala., for defendants.

HAND, District Judge.

This latest portion of the statewide *Lee v. Macon County Board of Education* litigation was initiated by the filing of two separate complaints. In the first complaint, filed on February 2, 1976, intervenors Bland and Thomas assert that they were denied their constitutional rights when the defendants refused to renew their teacher contracts at the close of the 1974–75 school year for the 1975–76 school year. In essence, these intervenors aver that the defendants failed to utilize objective non-racial criteria in considering whether their contracts would be renewed, and that the failure to renew was thus arbitrary and violative of the Fourteenth Amendment to the United States Constitution. Bland and Thomas requested that the Court find the actions of the defendants in refusing to renew their contracts to be violative of their constitutional rights, and that the defendants be ordered to reinstate Bland and Thomas to their rightful places within the school system.

The complaint of intervenor Samuel T. Gantt was filed on April 29, 1977. In his complaint Gantt alleges equal protection and due process violations of his Fourteenth Amendment rights by virtue of the fact that he was not promoted to a principal's position within the Conecuh System although he was allegedly more qualified than those persons who actually were appointed to the positions. Gantt alleges that he was passed over for such a promotion solely by reason of his race pursuant to the defendants' policy, practice, custom, and usage of restricting the number of blacks in key administrative positions within the school system. Like intervenors Thomas and Bland, Gantt requests that the Court find that the actions of the defendants violated intervenor Gantt's constitutional rights and order that he be appointed to a principalship position within the system and afforded back pay to compensate him for the allegedly wrongful failure to promote.

These matters were consolidated for judicial economy and trial efficiency and they came on for trial before the Court in Selma, Alabama, on November 3, 1978. The Court has considered the record, the testimony adduced at trial, the exhibits introduced at trial, and the memoranda of law propounded by counsel, together with the applicable law, and finds as follows:

## FINDINGS OF FACT

1. These suits are brought under authority of Title 28, U.S.C.A., § 1343(3) & (4), and are predicated upon Title 42, U.S.C.A., § 1983. For purposes of clarity, the Court has elected to enter separate findings with respect to the claims of the differing intervenors.

*A. John A. Bland and Luvenia Thomas*

2. Bland is a white United Methodist minister. He was first employed by the defendant Board as a junior high English teacher at Conecuh County High School in 1970. He was employed in this capacity until May of 1975, when, on the last day of the 1974–75 school year, he received a no-

tice telling him that his contract would not be renewed for the 1975–76 school year. Bland had been informed by Superintendent Pope prior to this that there was a good possibility that he might not be renewed because of a loss of federal funding.

3. During the 1970–71 and 1971–72 school years, Bland taught under a provisional certificate. However, Bland was a fully certified teacher during his last three years of teaching. The evidence is clear, however, that Bland was not a tenured teacher at the time that his contract was non-renewed in May of 1975.

4. Bland possesses a B.S. degree and a Master's degree in Divinity. He still possesses a Class A teaching certificate and lacks 6 hours in obtaining his certification in Educational Administration. He regarded teaching as a full time job with his pastorship as a part-time vocation. At the time his teaching contract was non-renewed, Bland earned $2,975.00 per year for his church work. This was increased after his non-renewal to $7,100.00 per year, and he now makes $10,700.00 annually.

5. Although Bland was told by Superintendent Pope that there was a good chance that he would be non-renewed at the close of the 1974–75 school year due to the lack of federal funds, Bland testified that his conversations with Pope led him to believe that he would be renewed if the funds were available.

6. The defendants placed great emphasis on Bland's teaching record during the trial in an attempt to justify the non-renewal. The basic differences between Superintendent Pope and Bland stemmed from one occasion when Bland allegedly resigned, reconsidered, and then took one or two days of sick leave after a racial incident at school, and another occasion when Bland allegedly called one or more of his students "stupid." Bland says that the racial incident resulted from some students complaining that they had been "overexercised" in their physical education class, and that the school was closed for a short period of time thereafter. While Bland admits that he may have said that he didn't have to put up

with such incidents, his testimony is that he never said or implied that he wished to resign. He also denies the sick leave allegation, stating that he was at work when school resumed after the disturbance. The complaint against Bland for calling a student "stupid" was initiated by the parents of Rita Jane Weaver, the alleged recipient of the remark. Bland recalls that the incident arose over Weaver's failure to find the correct page in her social studies book, but he doesn't recall what he may have said to her. There was no other testimony respecting Bland's competence as a school teacher.

7. Thomas is a black female who is presently employed as a store cashier. She worked for the defendant Board as a reading teacher in 1973–74 and as an English teacher in 1974–75 after having worked seven years as a teacher's aide. Thomas, like Bland, was given notice on the last day of the 1974–75 school year that her contract would not be renewed for the 1975–76 school year.

8. Thomas spoke with Pope after her non-renewal and was told that she would not be rehired in September because of a loss in federal funding. She later learned that some vacancies were being filled for the 1975–76 school year and again called Pope to see if she might be re-employed. He responded that she would not be rehired because the system had enough blacks for the coming year, and that whites were needed to fill the vacancies. Her testimony is that at no time was her prior teaching performance mentioned.

9. Thomas holds a B.S. degree in Elementary Education and a teacher's certificate in the same area. She was not a tenured teacher at the time that she was non-renewed.

10. Since her non-renewal, Thomas has done no teaching work, and she was unemployed for about 1½ years. She first worked after this as a cashier at a Junior Food Store making $2.30 per hour, and she now holds the same position at a Piggly Wiggly grocery store making $2.65 per hour.

11. As with Bland, the defendants seek to justify the non-renewal of Thomas on the basis of her performance record as a teacher. Superintendent Pope testified that Thomas' non-renewal resulted from the loss of federal funding and from her failure to improve as a teacher in the manner in which the defendant Board had expected her to improve. An evaluation conducted by Alex Johnson, Principal at Southside School where Thomas taught, did not bear out the conclusions of the Board. Johnson's evaluation (Plaintiff's Exhibit 43) indicated that he found Thomas' efforts to be completely satisfactory, ranking her good or excellent in every category. Johnson conducted his evaluation by sitting in Thomas' classroom and observing, and he testified that he felt that she had improved in her second year over her first year efforts. Johnson felt that Thomas deserved renewal, but he was not consulted on the question. The second evaluation of Thomas' performance was conducted by Ora Mason, the Supervisor of Elementary Education for the defendant Board. Her position requires her to constantly supervise elementary teachers within the system, and she has extensive training in specialized education dealing with reading. Mason goes to various elementary schools and reveals her presence to the principal without stating which teacher she is to observe. She then visits the teacher's classroom and observes the teacher's work, sometimes conferring afterwards with the teacher and making suggestions. Finally, she makes written reports of her observations for her own files, and she provides these files to the defendant Board or the Superintendent on their request. Mason observed Thomas' classroom performance on at least eight occasions during her two years as a teacher. Her observations (Defendant's Exhibit 2) revealed that Thomas' class was too undisciplined, that Thomas had poor communication with the students, that her enunciation of words was not in keeping with that expected of an elementary school teacher, that her classroom teaching techniques were not as good as they should be, and that she was in some cases making serious errors in her instructions to the students or in answering questions. Mason testified that she brought all of these observations to Thomas' attention, and that Thomas accepted the criticism politely and agreed that she needed to improve. Mason opined that Thomas had not made the progress expected by her of a first year teacher, and that she had passed her evaluations of Thomas on to Pope on various occasions. Mason explained the difference between her evaluation and Johnson's evaluation as a difference of opinion, and stated that she had never discussed Thomas' shortcomings with Johnson. She agrees that the most objective measurement of a teacher's performance is the success the teacher's students have afterward, but there is no evidence presented to the Court upon which such an objective measurement might be based.

12. At the close of the 1974–75 school year, thirty non-tenured teachers were informed that their contracts would not be renewed for the following year. Testimony of Superintendent Pope revealed that the massive non-renewal resulted from the Board's uncertainty with respect to whether previous federal funding would be continued, and to what extent it would be continued. Pope testified that the program was partially refunded for the next school year and that seven of the teachers who had been refused renewal were subsequently rehired, based on their teaching fields, their prior experience, and their prior conduct with the Board. Additionally, the defendants hired three new white elementary teachers who had no prior teaching experience.

### B. *Samuel Gantt*

13. Gantt is a black male who is presently employed by the defendant Board teaching remedial math in grades 1 to 6 at Conecuh County High School. He was first employed by the defendant Board in 1946 as a principal under the dual system then existing. Gantt was principal at China Junior High School for 13 years, supervising between 5 and 12 teachers. He then transferred to Lime Hill School as principal, where

he stayed 3 years and supervised five teachers. For three years after that Gantt was principal at Sandy Grove Junior High, supervising four teachers.

Gantt left the Conecuh system during the 1964–65 and the 1965–66 school years, teaching at Oak Grove School in Escambia County. He returned to the Conecuh system and his present position during the 1966–67 school year. He testified that his return was spurred by his wife's employment with the defendant Board and by a promise from Harvey Pate, the Superintendent at that time, that he would be offered an administrative position.

14. Gantt has a B.S. and a Master's degree in School Administration, and he has possessed the requisite certification for a principal or superintendent for the past 26 years. He has not served as a principal since the 1963–64 term, but he has continued to take upper level administration courses in the belief that educators must constantly act to upgrade themselves.

15. Although Gantt was allegedly promised an administrative position by Pate, the previous Superintendent, he has never been offered such a position. He taught five years in the system before he made formal application for such a position. On April 9, 1971, and June 13, 1972, Gantt wrote to Pate applying for such a position, and he made the same request to Pope in a letter dated August 6, 1975 (Plaintiff's Exhibits 20, 21, and 22). In none of these letters does Gantt mention the promise allegedly made to him by Pate.

16. Gantt was not afforded a principalship position or the offer of one at any time prior to the filing of his complaint, although the evidence reveals that there have been openings at Evergreen High School (twice), Repton High School, Lyeffion High, and Conecuh County High since his first letter of application.

At Evergreen High Howard Kitchens, a white, was principal at the time of Gantt's first application letter. He was replaced for the 1971–72 school year by James Hudson, a white, and thereafter by John W. Floyd, a black man.

At Lyeffion High Joe Baxley, a white, was principal when Gantt first applied. He was replaced for the 1971–72 and 1972–73 school years by Elbert D. Covin, another white man, and thereafter by Wilson Morgan, who is also white.

Wayne Pope, the present Superintendent, was principal at Conecuh County High at the time that Gantt first applied. He is white. He was replaced for the 1972–73 school year and thereafter by Haskew Page, Jr., another white man.

Harold Hanks, who is white, was principal at Repton High when Gantt first made application. He retired at the close of the 1976–77 school year, creating a principalship vacancy. At that time Gantt filed in this Court a motion for a temporary restraining order requesting that the defendant Board be restrained and enjoined from offering the position to anyone else without first offering it to Gantt. The Court denied the motion on the basis of evidence adduced at the hearing on the motion indicating that the Board intended to offer the position to a Mr. W. F. Royster, a black man. On this basis, the Court concluded that there was simply no evidence that the Board was discriminating against Gantt by reason of his race. However, during the trial on the merits in this matter, the evidence revealed that Royster turned down the offer (Plaintiff's Exhibits 16 and 17), and that the principalship duties at Repton High during the 1977–78 school year and during the present school year have been undertaken by David Johnson, the white assistant principal, while the Board has continued to advertise for new applicants (Plaintiff's Exhibit 18). The Superintendent testified that the position is being held open pending the outcome of this litigation, but while Johnson is nominally the assistant principal, he is being paid a principal's salary and Nora Stallworth, formerly a teacher, has been appointed to handle the assistant principal's duties. The Court finds from all of the evidence that the position at Repton High remains open, and that Johnson and Stallworth will resume their prior positions upon the selection of a qualified principal.

17. The defendants allege that Gantt received consideration for the Repton appointment and was rejected for reasons other than his race. In a letter to the Court dated July 8, 1977, (Plaintiff's Exhibit 44) counsel for the defendants stated that:

It is undisputed that the vacancy [at Repton High School] will be filled with a black. [Gantt] was considered for the vacancy and rejected for reasons other than his color. He is entitled to no more than consideration free of racial consideration. This he received.

While this may have been true at that time, there is no question but that Gantt is to be considered objectively once again for the Repton position now that Royster has declined the job.

18. On the issue of whether the defendants have previously refused a principal's position to Gantt because of his race, the defendants contend that the refusals have been based on non-racial considerations stemming from his prior performance both as a teacher and as a principal. The testimony of Superintendent Pope revealed five distinct grounds upon which he rests his conclusion that Gantt is not qualified to serve as a principal. The first problem is that Pope has heard that Gantt ran up a large milk bill for the school during the period when he was principal at Shadey Grove School. This was substantiated by other evidence revealing that during the 1962–63 school year the Board received a call from a local milk company complaining that it had been unable to collect a large milk bill run up by Gantt's school. No testimony was elicited with respect to whether the bills were ever paid, but it is clear that Gantt was never disciplined for the failure to make timely payments on the bills. The second issue of concern to Pope with respect to Gantt is the fact that Gantt has been subjected to garnishment in the past. Gantt admits that shortly after his return to the Conecuh system he had financial problems to the extent that he was paying his bills but he was not paying them on time. He neither admitted nor denied the allegations of garnishment. The third concern advanced by Pope dealt with Pope's own notes reflecting his opinion as a teacher when Pope was principal at the school where Gantt taught. On this basis, Pope questioned Gantt's ability to serve as a principal. Pope's fourth concern arose from the fact that on a previous occasion Gantt had refused to comply with the Board's rules on corporal punishment. Pope's final concern also dealt with Gantt's finances, since he testified that on a previous occasion he had been requested by an Evergreen business to help the business collect a debt owed by Gantt.

Beyond the individual concerns of the Superintendent, the observations of Ora Mason, the Board's Supervisor of Elementary Education, were also taken into consideration by the Board in declining to offer a principalship to Gantt. In her various visits to Gantt's classroom Mason noted (Defendants' Exhibit 1) that he gave his students erroneous information, that his lesson planning was poor, that he would not cooperate with her in some phases of the evaluation, that he got ready to leave prior to the end of the day and that he left his record work for other teachers, that his folders and files were not satisfactory, and that he seemed indifferent to her efforts at helping him improve. Her conclusions did not agree with Gantt's principal's evaluations (Plaintiff's Exhibit 31), but again she attributes this to a difference of opinion. As was the case with the students of Luvenia Thomas, there is no evidence before the Court by which the progress made by Gantt's students can be objectively measured.

19. The final contention of intervenor Gantt is that the refusal to promote him was based on a policy, practice, or custom of the defendant Board in making racially discriminatory employment decisions. Prior to the terminal order entered in this case there were fifteen schools in operation in the Conecuh County system, with ten black principals and five white principals. Now there are eight schools in the system, with five white principals and three black principals. There has been a 70% reduction in the number of black principals in the system, while the number of white principals has

stayed constant. Since Gantt returned to the system, only three of the sixteen principalship vacancies (19%) have been filled by blacks.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this lawsuit and the parties hereto by virtue of Title 42, U.S.C.A., § 1983.

2. Intervenor John Bland contends that his due process rights under the Fourteenth Amendment were violated when his contract was not renewed for the 1975–76 school year, premising his argument on the contention that he had an entitlement to such employment by virtue of his qualifications, experience, and his prior conversation with his principal and the superintendent.

In *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the United States Supreme Court discussed the law in the area of teacher dismissals that have Fourteenth Amendment implications and concluded that "the Constitution does not require opportunity for a hearing before the non-renewal of a nontenured teacher's contract, unless he can show that the decision not to rehire him somehow deprived him of an interest in 'liberty' or that he had a 'property' interest in continued employment, despite the lack of tenure or a formal contract." *Id.* at 599, 92 S.Ct. at 2698, 33 L.Ed.2d at 578. *See also Carmichael v. Chambers County Board of Education,* 581 F.2d 95, 97 (5th Cir. 1978). Under this test, where a non-tenured teacher, such as Bland, attacks the propriety of his dismissal, due process is not brought into question unless and until the plaintiff has established a legitimate property right or entitlement to his position.

The Court is of the opinion that in the instant case the evidence, viewed as a whole, does not establish any entitlement to or reasonable expectation of continued employment on behalf of Bland. The evidence is clear that as a non-tenured teacher Bland had no entitlement to continued employment. The burden therefore is upon Bland to establish the property interest upon which he relies to support his claim of entitlement, there being no allegation of any liberty interest involved. Bland's position is that his previous good performance together with the promises of his principal and superintendent that he would be rehired constituted a sufficient property interest to warrant due process before his dismissal. The Court cannot agree. At the outset the Court notes that Bland's prior performance is questionable in light of the evidence touching upon Bland's treatment of his students and his dedication to his work. Whether or not Bland was a good teacher is not known, but the evidence in the case certainly leads to the conclusion that his performance had been unacceptable. Beyond this, the Court refuses to create an entitlement for Bland based on statements or promises made by the principal and the superintendent. The hiring of teachers is solely within the province of the Conecuh County Board of Education, and the promise of continued employment to Bland by the principal or the superintendent carries about the same weight as a promise by the weatherman that there is no chance of rain on Saturday. As a further point, even if the Court was constrained to find entitlement by virtue of the promise, the promise was that Bland would be re-employed if funding was available. The evidence is clear that funding was available for only seven of the thirty jobs affected, so it cannot be said that the condition precedent of the promise to Bland was ever present. The Court having concluded that Bland has failed to establish any entitlement to continued employment for the 1975–76 school year, the Court's verdict must be for the defendants on the Bland intervention.

3. Intervenor Luvenia Thomas initially based her complaint purely on the defendant Board's failure to utilize non-racial objective criteria in determining which teachers were to be non-renewed at the close of the 1974–75 school year, but she later amended to claim that the defendant Board's failure to rehire her was motivated by race.

At the outset, the Court notes that *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1970), does not apply to the purge of May 1975, since the non-renewals did not result from the desegregation process but rather from a lack of funding. The Court has considered the evidence, especially that touching upon Thomas' prior performance, and the Court concludes that there was no impropriety in the 1975 dismissal of Thomas.

The Court cannot reach the same conclusion, however, with respect to the Board's later refusal to rehire Thomas for the 1975–76 school year. It appears from the evidence that the rehiring decisions of the Board were racially motivated to the extent that the Board hired to fill "white vacancies" and "black vacancies" instead of seeking the most qualified applicants. Such ratio-based employment practices have been specifically rejected in this Circuit in *Lee v. Russell County Board of Education*, 563 F.2d 1159 (5th Cir. 1977), and there is no question but that such practices violate prior orders of this Court and those of the three judge panel. The issue here is not whether Thomas was or was not qualified to serve as a teacher, for the ratio-based hiring practices of the defendant Board precluded her from ever even receiving consideration. The Court is of the opinion that lack of qualification is no defense to such discriminatory hiring practices. Accordingly, since Thomas was denied renewal by reason of her race, the Court is of the opinion that intervenor Thomas was denied her constitutional rights by the defendant Board in the summer of 1975, and that she is entitled to back pay and reinstatement from the Board as a remedy for the deprivation.

Institute records for the 1974–75 school year (Plaintiff's Exhibit 7) indicate that Thomas was paid a yearly salary of $8,045.00 during the year prior to her non-renewal. The evidence further revealed that had she continued her employment with the Board she would have been paid $9,105.00 in 1975–76, $9,165.00 in 1976–77, $10,355.00 in 1977–78, and $5,762.50 in the first half of the 1978–79 school year (Plaintiff's Exhibit 46). Thus, she would have received $34,387.50 from the School Board to this date but for the violation of her rights. Thomas' evidence with respect to mitigation is inconclusive, the Court not having been given any specific figure setting forth the total amount of money she had made during this period. She did testify that she was unemployed for a year and a half and that she had worked as a store cashier since then for $2.35 and $2.60 per hour. The Court is unable to formulate any total mitigation amount from these figures without speculation, and thus the back pay issue must be reserved pending further hearings. The Court instructs counsel for both sides that income tax records, check stubs and W–2 forms, and records from the State Unemployment Office would be the best evidence in this area.

5. Intervenor Gantt seeks appointment to a principal's position and back pay from the time he was first allegedly wrongfully denied such appointment. The crucial question on Gantt's intervention is whether he has been passed over for such an appointment because of his race due to the Board's alleged policy and practice of restricting the number of blacks in key administrative positions, or whether the non-promotion has resulted from the Board's good faith concern relating to Gantt's competency to serve as a principal.

The thrust of the evidence reveals that on two occasions since Gantt first made application the defendant Board has selected white applicants to serve as principals at a traditionally white school, despite the fact that Gantt was allegedly better qualified on the basis of non-racial objective criteria. The Court cannot conclude whether Gantt was actually better qualified on this basis, for the Board has not adopted any such non-racial objective criteria and, until this is done, the Court will never be in a position to adequately consider the propriety of any

principal selection made by the Board.[1] However, the Court is aware of no authority by which the Court should even be called upon under the facts of this case to consider the relative qualifications of the various principal applicants, which intervenor Gantt would have the Court do in this case.

■ With respect to intervenor Gantt's petition, the Court is not convinced that he is the most qualified candidate available for the principalship at Repton High School, the most recent vacancy and the position now open. At the outset it should be noted that Gantt's *Singleton* rights are not at issue in this suit, since he was not serving as a principal at the time of prior desegregation orders. *See Hardy v. Porter,* 546 F.2d 1165 (5th Cir. 1977). Accordingly, Gantt had no rights of first refusal, and the burden falls upon him to establish that the failure to promote him to principal had been racially motivated.

■ Drawing from equal employment law, the Court is of the opinion that to establish a prima facie case of racial discrimination bearing upon the refusal to promote, the plaintiff has the burden of establishing by a preponderance of the evidence that he is a member of a racial minority, that he applied for and was qualified for appointment to a principal's position, that he was rejected despite his qualifications, and that following his rejection the Board continued to consider applicants from persons similarly qualified and the position remained open. *Cf. Furnco Construction Company v. Waters,* 438 U.S. 567, 573, 98 S. Ct. 2943, 2948, 57 L.Ed.2d 957, 966 (1978), *quoting McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[2] Intervenor Gantt ef-

fectively established each of these factors, thus casting upon the defendant Board the burden to establish by clear and convincing evidence that the refusal to promote the plaintiff was not racially motivated, for the clear import of equal protection law is to insure that employment decisions are based on legitimate considerations. *See Furnco, supra,* 438 U.S. at 578, 98 S.Ct. at 2950, 57 L.Ed.2d at 968.

The defendants seek to rebut intervenor Gantt's evidence by suggesting that he is not qualified to serve as a principal. The evidence is indeed strong that Gantt is not even a responsible teacher (Defendants' Exhibit 1). However, Gantt questions the propriety of the defendants' challenging of his qualifications at this time, since the qualifications were never challenged during the earlier fifteen years that he served as a principal. Had this case arisen under *Singleton,* the defendants would bear a heavy burden, since in order to fulfill that burden the Board would be required to establish quite clearly why one who was qualified prior to a desegregation order suddenly became unqualified after the order. *Lee v. Macon County Board of Education,* 483 F.2d 242, 243 (5th Cir. 1973) (Colbert County); *Lee v. Macon County Board of Education,* 453 F.2d 1104, 1110 (5th Cir. 1971) (Muscle Shoals); *McCurdy v. School Board of Palm Beach County,* 367 F.Supp. 747, 750–51 (S.D.Fla.1971). This is not a *Singleton* situation, however, so these decisions are of less weight to the Court's concern with whether the refusal to promote Gantt was racially motivated.

■ The Court's review of the evidence convinces the Court that the refusal to promote Gantt was based on other than racial

1. By a separate order entered this day the Court is requiring the defendant to submit for the Court's approval, by March 15, 1979, the non-racial objective criteria which the Board proposes to employ in making future employment decisions. Hopefully, utilization of such criteria will eliminate litigation such as this.

2. Since this action arises under Title 42, U.S. C.A., § 1983, there may well be a further burden on the plaintiff-intervenor to establish discriminatory intent. *See Washington v. Davis,*

426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The statistics in this case indicate such a racially discriminatory animus, however, since there has been a 70% reduction in the number of black principals in the system while the number of white principals has stayed constant, since the traditionally white schools have continued to have white principals, and since the Board has failed to adopt objective non-racial criteria to assist its deliberations on principal selections.

considerations. Additionally, the evidence is clear that the defendants' articulated nondiscriminatory reasons for refusing to promote Gantt were not just a pretext for discrimination. At the outset, the Court notes that had negotiations for the appointment of W. F. Royster to the principal's position at Repton High School been finalized, Gantt's claim to this position would be rendered moot due to the fact that another black had received the appointment. There is no question in the Court's mind that the defendants actively and in good faith sought a black for the Repton position, apparently any black other than Gantt. The Board's distaste for Gantt is clearly predicated on grounds other than race, stemming rather from their past experiences with him and from the evaluations that he received as a teacher.[3] The Court finds nothing improper in the conduct of the defendants, for they are under injunction from this Court to hire the best qualified applicant for teaching positions regardless of race or color. Clearly past experience with an applicant and his teaching ability are appropriate considerations for the Board in hiring a principal.

The evidence before the Court convinces the Court further that it was this non-racially discriminatory distaste of the Board for Gantt that led to their refusal to promote him in the earlier situations, rather than any racial animus. The Court is of the opinion that the Constitution was not intended to create promotions for employees deemed unqualified by the employers for articulable, non-discriminatory reasons.

From the sum of the evidence, the Court is of the opinion that Gantt is without *Singleton* rights in this action and that his evidence failed to support his claim that he was refused promotion on racially motivated grounds. For these reasons, the Court must find in favor of the defendants on Gantt's complaint in intervention.

3. The Court notes that it has been almost fifteen years since Gantt last served as a principal and that the administrative duties involved in his prior positions were vastly different from those involved today at Repton High School.