Gregory M. BROWN, Plaintiff,

v.

FRANK IX AND SONS, INC.,
Defendant.

Civ. A. No. 80–0003–C.

United States District Court,
W. D. Virginia,
Charlottesville Division.

Jan. 21, 1982.

Steven D. Rosenfield, Deborah C. Wyatt, Charlottesville, Va., for plaintiff.

Paul M. Thompson, Christine H. Perdue, Richmond, Va., for defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiff, Gregory M. Brown, brings this action against his former employer, Frank Ix and Sons, defendant, seeking declaratory and permanent injunctive relief and for damages to redress alleged deprivation of rights secured to the plaintiff under the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiff has properly invoked the jurisdiction of this court pursuant to 28 U.S.C. §§ 1331, 1334, 2201, and 2202, this being a suit authorized and instituted pursuant to the Civil Rights Act of 1866.

Plaintiff, a black man, was hired as a beamer helper in the preparation department of defendant's textile plant beginning June 7, 1978. On August 24, 1978, Brown's supervisor, Roger Fitzgerald, found Brown asleep on top of a transporter. At that time, Brown was warned by Fitzgerald not to go to sleep again. On September 20, 1978, Fitzgerald found Brown asleep a second time, this time on top of some boxes

behind the warper creels. Mr. Brown was suspended that day, and on September 27, 1978, Brown was dismissed for having been found asleep on two separate occasions and for his poor attendance record. Mr. Brown maintains that the defendant employs white employees who have been found sleeping while at work on two or more occasions but have neither been suspended or terminated. Mr. Brown asserts that the different treatment between white and black employees constitutes discrimination on the basis of race and thus is in violation of his civil rights pursuant to 42 U.S.C. § 1981. The plaintiff makes no other claims of racial discrimination against the defendant other than that arising from his discharge. In fact, the plaintiff stipulated that Roger Fitzgerald and other Ix supervisors had treated him fairly and that he has no reason to believe that they disliked him personally. In addition, Brown knows of no other employee of defendant, black or white, who has been terminated for sleeping on the job.

Defendant denies that plaintiff was discharged because of his race, but rather submits that the discharge was a result of plaintiff twice being caught asleep on the job and because of his absentee problem.

This action was heard by the court, sitting without a jury on February 17 and 18, 1981.

This case is brought under § 1981, not Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*). Thus, at the threshold lies the question of what is the *quantum* of proof required of the plaintiff in order to establish a *prima facie* case of discrimination under 42 U.S.C. § 1981. In this Circuit, it is clear that plaintiff must show that he was treated less favorably than a similarly situated white employee. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). What is not as clear is whether plaintiff is required to make out a showing of purposeful discrimination. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844 (4th Cir. 1979). This court holds that plaintiff is required to make a showing of purposeful discrimination.

Until the decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), it was generally assumed that the same standards of proof applied under § 1981 and Title VII. Employment practices having a disparate racial impact were held unlawful regardless of intent, unless justified as a business necessity. *See, Boston Chapter, NAACP, Incorporate v. Beecher*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Carter v. Gallagher*, 452 F.2d 315 (8th Cir. 1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

In *Washington v. Davis, supra*, plaintiffs alleged, *inter alia*, a claim under § 1981 that the District of Columbia's examination for police applicants violated the Fifth Amendment. The examination was alleged to have resulted in the exclusion of a disproportionately high number of black applicants. There was no allegation of intentional discrimination. The District Court granted summary judgment for the defendant on this claim; the Court of Appeals reversed; and the Supreme Court in turn reversed the judgment of the Court of Appeals. The Court held, in part, that in the absence of a racially discriminatory purpose, official action does not violate the equal protection guarantees of the Fifth and Fourteenth Amendments simply because it has a racially disproportionate impact.

*Washington v. Davis, supra*, did not decide whether in actions under § 1981 plaintiffs must prove discriminatory purpose. The Court's discussion focused on proof requirements under the Fifth and Fourteenth Amendments; § 1981 was not mentioned in this context. The Court's order that summary judgment be granted for the defendant has never been taken to imply that § 1981 requires proof of intent to discriminate. Such a reading, however, was not required, in that summary judgment on the § 1981 claim is adequately supported by the Court's holding that the defendant had proved the examination to be job related.

Moreover, the focus on the Constitutional flaw in the decision under review may have been dictated by the Court's action in raising the intent issue *sua sponte.* The Court raised this issue under its own rule allowing notice of "a plain error not presented". *Washington v. Davis, supra* 426 U.S. at 238, 96 S.Ct. at 2047.

The legislative history of § 1981 shows that although it rests in part upon the Thirteenth Amendment, *see, Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), its origin was closely tied to the Fourteenth Amendment. *Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977), *vacated as moot,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 625 (1979). A number of courts have relied on this connection in finding the same intent requirement as under the Fourteenth Amendment. E.g., *Mescall v. Burrus,* 603 F.2d 1266 (7th Cir. 1979); *Johnson v. Hoffman,* 424 F.Supp. 490 (E.D.Mo.1977), *aff'd,* 572 F.2d 1219 (8th Cir. 1977), *cert. denied,* 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978). The legislative history also shows that Congress in enacting the first precurser of § 1981 meant it to deal with the most egregious forms of reactionary white conduct, not to fashion an evidentiary presumption designed to root out more subtle forms of discrimination. *See* Note, "Racially Disproportionate Impact of Facially Neutral Practices—What Approach Under 42 U.S.C. §§ 1981 and 1982?, 1977 *Duke Law Journal* 1267, 1279–80.

Although legislative history is not conclusive; *see Runyon v. McCrary, supra,* the policy concerns which led the Supreme Court in *Washington v. Davis* to hold that the Fourteenth Amendment requires proof of intent support a similar interpretation of § 1981. The court there thought it appropriate to "await legislative prescription" before extending to new areas the rule that facially neutral action is illegal if in practice it benefits or burdens one race more than another.

■ Title VII of the Civil Rights Act of 1964 was such a legislative prescription in the field of employment. Title VII pro-scribes conduct based on proof of its racially discriminatory impact alone, *Griggs v. Duke Power Company,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), but it does so in the context of a procedural scheme which subjects claims to a prior administrative screening investigation and a uniform short statute of limitations. § 1981 cases may be filed without prior screening and within the varying time limits provided by state laws. The absence of mechanisms to control the filing of what may be baseless claims, or claims which have been rendered more difficult to defend by the passage of time, warrants, as a matter of policy, judicial adherence to a higher standard of proof under § 1981, at least until further legislative action.

■ Moreover, § 1981 applies to a whole range of contractual relationships other than employment. As discussed above, the legislative history of § 1981 lacks any indication of intent to outlaw conduct on the basis of racially disparate impact alone. § 1981 therefore does not supply the "legislative prescription" that the Supreme Court regarded as necessary for expanding the rule into new areas. Thus, this court agrees with the majority of courts which have decided the issue, that proof of discriminatory intent is required in actions brought under § 1981.

■ Therefore, in the case at bar, in order for plaintiff to make out a *prima facie* case he must show: 1) that there was at least one similarly situated white employee who received more favorable treatment because of race, and 2) that defendant's actions were motivated by an intent to discriminate against the plaintiff because of his race. The court finds that plaintiff has failed to establish either requirement. Having found failure to meet the first requirement, it is not necessary in strict logic, to consider the second requirement. It is treated *infra* in this opinion, however, so that the opinion may deal completely with the issues raised.

The facts adduced at trial established that the plaintiff was hired as a beamer

helper in the preparations department on the third shift at defendant's Charlottesville facility on June 7, 1978. Plaintiff was interviewed and recommended for employment by Roger Fitzgerald, a white man, who was Brown's immediate supervisor throughout the term of his employment. Fitzgerald granted Brown a leave of absence between July 17, 1978, and August 16, 1978, on account of illness. In addition, Brown was absent without excuse nine other days during the three and one-half months of his employment. On August 24, 1978, Fitzgerald found Brown asleep on top of a transporter. Brown was given a written reprimand and warned by Fitzgerald not to go to sleep again. On September 20, 1978, Fitzgerald found Brown asleep a second time, this time on top of some boxes containing yarn, back behind the warper creels. This time Fitzgerald sent Brown home. Subsequently, on September 27, 1978, Brown received his termination notice after Fitzgerald consulted with his superiors, Mr. Howard West and Mr. Claude Reeves. Mr. Brown's termination notice refers to his having been found asleep twice on the job and to his record of absenteeism.

Approximately three months after his discharge, Brown filed a charge of discrimination against Ix with the EEOC. As a result, Mr. Brown received a right to sue letter from the EEOC on August 16, 1979, and on January 2, 1980, this action was instituted.

Thomas Lee Ayers, a white man who worked the third shift as a slash operator during 1978, testified on behalf of the plaintiff. Mr. Ayers testified that his supervisor, Roger Fitzgerald, had caught him sleeping approximately half a dozen times while leaning over his machine. (Tr. 50). Ayers avers that at the time he was caught his eyes were closed and he was not conscious of his machine. Ayers states that he has never received a written reprimand for sleeping but rather his worst punishment has been being sent home for the night. Mr. Ayers further testified that he witnessed Mr. Howard West catch Charles Conley, a white man, asleep at his machine, and that Roger Fitzgerald on numerous occasions observed Sidney Riley, a white man, asleep while leaning over his machine. On cross-examination, Thomas Ayers testified that he observed Roger Fitzgerald catch Percy Ayers and James Morton, both black men, asleep while working at their machines on more than one occasion. On these occasions, Mr. Fitzgerald encouraged the employees to walk around, get a cup of coffee, and splash cold water on their faces. (Tr. 51–70).

Roosevelt Williams, a black man and slasher operator for the defendant on the third shift, testified that on numerous occasions he observed both Percy Ayers and Charles Conley asleep at their respective machines, but admitted that he had only seen each of them caught sleeping once. Mr. Williams stated that in the twelve years he has worked at Ix, the plaintiff is the only person he has seen or heard of sleeping on a transporter or on top of the boxes of yarn. (Tr. 77–91).

Charles Conley testified that he slept a great deal while sitting at or leaning over the machine at which he was a helper. On direct examination, Mr. Conley testified that both Mr. Fitzgerald and Mr. West caught him asleep "a whole lot" while in these positions. (Tr. 98). On cross-examination, however, Mr. Conley recants his testimony by admitting that he has been caught asleep only once by Mr. West and Mr. Fitzgerald. (Tr. 134, 135, 139, 140). Mr. Conley explains that on all other occasions when he was approached by Mr. Fitzgerald and told to get up, walk around, get a cup of coffee, etc. that he was only nodding, and not sleeping. (Tr. 138–140). Mr. Conley further testifies that he has seen Mr. Fitzgerald catch Sidney Riley asleep only once, (Tr. 130); that he has observed black employees as well as white sleeping on the job, (Tr. 127); and that Mr. Brown was the only employee he has ever seen or heard of sleeping on the yarn boxes back behind the warper creels. (Tr. 124). Mr. Conley further testified that he quit his job with the defendant in 1979 and has, on several occasions, tried unsuccessfully to get his job back. (Tr. 121).

Mr. James Morton, a black employee of the defendant and a relative of the plaintiff by marriage, testified that he had seen Conley asleep on numerous occasions, and that Howard West had caught Conley asleep on two of these occasions. (Tr. 205). Mr. Morton further stated that he had never seen Sidney Riley or Percy Ayers caught sleeping by a supervisor. (Tr. 207–208).

Gregory Brown does not dispute the fact that he was twice caught sleeping by Roger Fitzgerald or that he was absent 41 days, nine of which were unexcused, in the approximately three and one half months he was employed by the defendant. A careful review of the plaintiff's testimony on the whole case gives the reviewer some pause in assessing the plaintiff's credibility, in that plaintiff, among other things, appears more unwilling than unable to answer relevant questions about the events at issue, about his previous and subsequent employment history, etc.

Bessie Frank, an Ix employee for the past 26 years, testified that she went looking for the plaintiff, in order to have him get her some yarn, and that when she found him he was fast asleep on top of some boxes of yarn with his jacket under his head. (Tr. 222). She states that she returned to the boxes a couple of times and on that basis, estimates that he was asleep for more than two hours. Mrs. Frank further testified that she had seen Brown asleep back on the boxes two or three different times and that she has never seen any other employee asleep back on the boxes. (Tr. 223). She also states that Jeff Brown, a white man, is the only other person she has ever seen or heard of sleeping while at Ix.

Ethel Glass, an employee of Ix for the past 17 years, also testified that, on more than one occasion, she had witnessed the plaintiff asleep on the boxes of yarn behind the warper creels and that Mr. Brown was the only employee she had ever seen asleep on the boxes. (Tr. 236).

Mr. F. Sidney Riley, an Ix employee for 37 years, testified that he asked his supervisor, Roger Fitzgerald, for some help in getting some yarn for his Tsudakoma (a machine used in the plant), and was told to go back and get Greg Brown to help him. Riley explained that when he found Brown, he was asleep, lying stretched out on top of the boxes behind the warper creels with his jacket under his head. (Tr. 284). About ten minutes later, Roger Fitzgerald asked Riley if he had gotten Brown to help him. Riley responded that Brown was back lying on the boxes with a jacket under his head. (Tr. 292). Riley also testified that he had never seen any other Ix employee asleep back on the boxes of yarn, but explained that there was only one yarn boy per shift and thus Gregory Brown would have been the only one back there working.

Roger Fitzgerald, Brown's supervisor, testified about the events surrounding Brown's employment by Ix. Fitzgerald told of Brown's absentee problem and of the two times he found Brown asleep while on duty. Fitzgerald averred that he recommended Brown be fired because of his poor attendance and due to the fact that he had been caught sleeping twice. Fitzgerald stated that he did not have the authority alone to terminate Brown, nor did he discuss Brown's race with either Mr. West or Mr. Reeves. Fitzgerald stated that he had never found another employee asleep on a transporter or on top of the yarn boxes, and that he had never had occasion to discipline other black employees for sleeping on the job, but had punished three whites: Tommy Ayers, Jeff Brown, and Charles Conley. (Tr. 3003250. Fitzgerald said that he personally had never witnessed Conley sleeping, only nodding, but punished him when Howard West reported that he had seen Conley sleeping.

While some of the above stated evidence is conflicting as to whether any white employee was ever found sleeping on more than one occasion, the court finds no white employee similarly situated to that of the plaintiff. In the first instance, the plaintiff has produced no evidence of any white employee with as poor an absentee record as the plaintiff.

In a very real sense, at least some of the evidence conflict is raised by semantics.

Plaintiff's evidence as to other employees "sleeping" is countered by the facts of location of such other employees, i.e., at their respective machines, usually sitting, and defendant's evidence that employees were found nodding or dozing at their machines, and were urged by supervisors to walk around, get coffee, or wash their faces in cold water. What may semantically have been deemed to be "sleeping" by the plaintiff and his witnesses may have been deemed, again semantically, by the defendant and its witnesses to have been "nodding". Whether a semantic problem or not, the difference is significant in the resolution of this case.

No white employee has been shown by the evidence to be sleeping in a manner which suggests an intent to go to sleep and avoid discovery. The court accepts plaintiff's contention that the area in which the plaintiff was found to be sleeping, like the areas of work of other employees, was in the area in which the plaintiff, as a yarn boy, would be expected to work. Nevertheless, no other employee was found to be sleeping horizontally, for at least two hours, with a cushion (jacket) or some like object under his head. Being caught sleeping (or nodding) while standing or sitting at a machine cannot be said to suggest the intent to fall asleep that is clearly inferred by one who lies down horizontally and arranges himself for sleeping. These facts, coupled with the court's finding that the most credible evidence before the court is that no white employee was found sleeping on more than one occasion, leads this court to hold that there was no similarly situated white employee, when compared to the situation of the plaintiff.

The only evidence that plaintiff has presented as to the defendant's intent to discriminate racially, other than what can be inferred from the above recited testimony, is the testimony of Roosevelt Williams and James Morton. Roosevelt Williams testified that several whites, with less seniority than he, were promoted ahead of him. James Morton also testified that whites with less seniority than he had been promoted ahead of him. On cross-examination, however, Morton admitted that it was at Fitzgerald's request, and not his, that he be made an operator. (Tr. 212). Morton also admitted that the reason he had not been promoted faster was because he had missed a lot of time at work.

On the other hand, the following facts strongly suggest a lack of intent on the part of the defendant to discriminate racially against the plaintiff: Fitzgerald interviewed and hired Brown, requested raises for Brown, and granted him an extended leave of absence. Brown never made any complaints about racial discrimination and further stipulated that he never felt he was being treated unfairly because of his race. (Tr. 179). Such a stipulation by the plaintiff himself weighs heavily against the plaintiff in assessing the significance of the testimony of Williams and Mortin, summarized *supra*, on the question of the defendant's alleged intent to discriminate racially. Indeed, the testimony was that the defendant had no knowledge of Brown's charges of racial discrimination prior to receiving notice of his EEOC action. Fitzgerald testified, as did Mr. West and Claude Reeves, that Fitzgerald did not have the authority to discharge employees. Fitzgerald testified that he never considered Brown's race in recommending his discharge, nor did he discuss plaintiff's race with West or Reeves when discussing whether to discharge plaintiff. Rather, it was Fitzgerald's testimony that he recommended that Brown be discharged because of his poor attendance record and for being caught sleeping twice. Claude Reeves, the highest level of management to consider the plaintiff's discharge, testified that it was his decision to let Brown go, and that he in fact did not know Brown was black. Fitzgerald has testified that it was not his policy to discipline employees that he personally did not find asleep and that it was also his policy, when he observed an employee nodding, to encourage the employee to move around, to get some coffee, and to wash his face. He did not issue written reprimands to employees unless, in his judgment, they were, in fact, asleep. Plaintiff's evidence does not

support a finding that the defendant has acted contrary to this policy.

As an additional note, unrefuted evidence was introduced that 17.3 percent of the defendant's workforce is black, 24 percent on the third shift. In light of the fact that 15.6 percent of the workforce in Charlottesville, Virginia, is black according to the Virginia Employment Commission, no pattern of racial discrimination can be inferred from these statistics. Additionally, there have not now, or ever, been any other claims or charges of racial discrimination made against the defendant by any of their numerous black employees.

For these reasons, the court finds that the plaintiff has failed to carry the burden, first, of showing that there was at least one similarly situated white employee who received more favorable treatment because of his race and, second, that the defendant's actions were motivated by an intent to discriminate against the plaintiff because of his race.

For these reasons, an appropriate Order will this day be entered granting judgment for the defendant.