#30970-a-PJD
**2026 S.D. 12**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE
PETITION OF SIGRID KRISTIANE NIELSEN
FOR AN AMENDED BIRTH CERTIFICATE.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARGO NORTHRUP
Judge

* * * *

ROBERT D. TRZYNKA of
Halbach Szwarc Law Firm
Sioux Falls, South Dakota                    Attorneys for appellant Sigrid
                                             Nielsen.


HOWARD PALLOTTA of
South Dakota Department of Health
Pierre, South Dakota                         Attorneys for appellees
                                             Department of Health.

* * * *

CONSIDERED ON BRIEFS
OCTOBER 7, 2025
OPINION FILED **03/04/26**

#30970

DEVANEY, Justice

[¶1.]         Sigrid Nielsen, a transgender woman, filed a petition in circuit court to amend her birth certificate to change the sex designation from male to female to reflect her current gender identity. The court denied the petition. Nielsen appeals, asserting that the court erred when interpretating the applicable administrative regulation and that the failure to amend her birth certificate is a violation of her constitutionally guaranteed equal protection rights. We affirm.

## Factual and Procedural Background

[¶2.]         On September 24, 2024, Nielsen filed a petition with the circuit court to amend her birth certificate. The petition stated that her original birth certificate lists her name as Michael Christian Nielsen and her "gender marker" as male. The petition further states that Sigrid's birth name on the certificate is no longer accurate because the State of Minnesota has legally recognized her name change to Sigrid Kristiane Nielsen. Nielsen's petition requested an order recognizing her name change and directing the South Dakota Department of Health (Department) to issue "a replacement birth record" identifying her name as "Sigrid Kristiane Nielsen and her legal gender as female."[1]

[¶3.]         The circuit court denied Nielsen's petition and requested that the matter be briefed and set for hearing. Nielsen submitted a pre-hearing brief and an affidavit attaching Nielsen's Minnesota driver's license and her passport, which both identify her as female. In her brief, Nielsen noted that the Equal Protection

---

1.    Nielsen's appeal pertains only to the circuit court's denial of her request to amend the sex designation on her birth certificate.

-1-

Clause requires similarly situated individuals to be treated alike and argued that she has a constitutional right to ensure that her birth certificate reflects her accurate gender identity. In support, she relied on *Obergefell v. Hodges*, which held that "[t]he Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." 576 U.S. 644, 651–52 (2015) (holding that under the Due Process and Equal Protection Clauses, same-sex couples may not be deprived of their fundamental right to marry). She therefore claimed that laws that disparately affect the right of transgender individuals to amend the sex designation on their birth certificates violate the Equal Protection Clause and require heightened scrutiny.

[¶4.] After the hearing, the circuit court issued a written opinion denying Nielsen's petition. The court noted that ARSD 44:09:05:02, the administrative rule governing amendments of vital records, authorizes the correction of incorrect data. The court characterized the question raised by the petition as "whether data that was correct at the time that the vital record was created . . . qualifies as incorrect data at some later date as a result of changed circumstances." When interpreting the language of this rule, the court held that it clearly and unambiguously requires the data sought to be amended to have been incorrect at the time or shortly after the birth certificate was created. The court reasoned that a "birth certificate is a very specific document evidencing the birth of a child" and "is not intended to chronicle a person's life and associated changes."

[¶5.]    The circuit court also held that the statute and regulations at issue did not run afoul of the Equal Protection Clause. The court determined that the vital records statutes do not encompass a fundamental right, nor do they contain a suspect classification. In so concluding, the court noted that the United States Supreme Court has not recognized transgender status as a suspect class, citing cases from other courts noting the same and holding that transgender individuals do not constitute a suspect or quasi-suspect class. The court therefore concluded that rational basis review applies. The court found there is a rational goal underlying the administrative rule at issue, namely, the accurate recording of the sex of newborns. The court also found that the rule is rationally related to legitimate state interests, as noted by other courts addressing this issue, including the protection of the integrity and accuracy of vital records, preparing and publishing reports of vital statistics, and tracking important medical and social trends to aid public health.

[¶6.]    Nielsen appeals, asserting the following issues for our review:[2]

1.    Whether the circuit court correctly interpreted ARSD 44:09:05:02.

2.    Whether the circuit court's application of ARSD 44:09:05:02 to deny Nielsen's request for an amended birth certificate violated her equal protection rights.

---

2.    The record does not reflect that the Department received notice of the petition below, and it did not participate in the hearing. After Nielsen filed her notice of appeal, we issued an order requiring Nielsen to serve a copy of her appeal brief on the Department and directed the Department to submit a responsive brief.

## Standard of Review

[¶7.] The interpretation and application of statutes and administrative rules "are questions of law that we review de novo." *Puffy's LLC v. Dep't of Health*, 2025 S.D. 10, ¶ 26, 18 N.W.3d 134, 142 (citation omitted); *see also In re Black Hills Power, Inc.*, 2016 S.D. 92, ¶ 8, 889 N.W.2d 631, 633. We also "review claims of constitutional violation[s] under the de novo standard of review." *State v. Springer*, 2014 S.D. 80, ¶ 9, 856 N.W.2d 460, 464 (quoting *State v. Mesa*, 2004 S.D. 68, ¶ 9, 681 N.W.2d 84, 86).

## Analysis and Decision

### 1. *Whether the circuit court correctly interpreted ARSD 44:09:05:02.*

[¶8.] Nielsen challenges the circuit court's determination that ARSD 44:09:05:02 only allows for the amendment of data that was incorrect at the time of or shortly after birth. The Department may amend a birth certificate upon receipt of a request that includes an affidavit of correction, or upon receipt of an order from a court. ARSD 44:09:05:02. Both avenues require the following information: "(a) [i]nformation to identify the certificate; (b) [t]he incorrect data as it is listed on the certificate; and (c) [t]he correct data as it should appear." *Id.* Nielsen claims the regulation's reference to "correct data as it should appear" allows her to seek an amendment of the sex designation on her birth certificate to reflect her current gender identity.

[¶9.] "When engaging in statutory interpretation, we give words their plain meaning and effect, and read statutes as a whole, as well as enactments relating to the same subject." *Paul Nelson Farm v. S.D. Dep't of Rev.*, 2014 S.D. 31, ¶ 10, 847

N.W.2d 550, 554 (citation omitted). The same tenets applied to statutory construction are applied when we interpret administrative rules. *First Gold, Inc. v. S.D. Dep't of Rev.*, 2014 S.D. 91, ¶ 6, 857 N.W.2d 601, 604 (citation omitted). We have also stated that, "[c]ourts should not enlarge a statute beyond its declaration if its terms are clear and unambiguous." *De Smet Ins. Co. of South Dakota v. Gibson*, 1996 S.D. 102, ¶ 7, 552 N.W.2d 98, 100. An overview of the statutory scheme and related administrative rules pertaining to the amendment of a vital record is a helpful starting point when analyzing Nielsen's arguments why, in her view, the circuit court erroneously interpreted ARSD 44:09:05:02.

[¶10.] All births in South Dakota are required to be registered with the Department through the filing of a certificate of birth. *See* SDCL 34-25-8. The birth certificates, on forms prescribed by the Department, must be filed within seven days of the birth. *Id.* If a birth certificate is filed after seven days, "the Department may, by rules promulgated pursuant to [SDCL] chapter 1-26, require additional evidence in support of the *facts of birth.*" *Id.* (emphasis added). The statutes relating to what is recorded on a birth certificate also identify who can certify the "facts of birth." When "a birth occurs in an institution, the physician in attendance at the birth or the physician's designee shall . . . obtain the personal data and the medical information required by the certificate and provide it to the person designated by the institution to file the certificate." SDCL 34-25-9. When the birth occurs outside an institution, SDCL 34-25-9.1 requires the physician or other person in attendance at or immediately after the birth, or the father or mother, to prepare and file the certificate. This statute further provides that the

Department "shall promulgate rules . . . to establish the evidence necessary to establish the *facts of birth.*" *Id.* (emphasis added). The Department is also authorized, under SDCL 34-25-51, to promulgate rules governing amendments to vital records. Accordingly, ARSD 44:09:05:02 provides the general requirements for amending a birth certificate.

[¶11.] When interpreting the requirement in ARSD 44:09:05:02 that a court order directing an amendment must provide the "incorrect data *as it is listed on the certificate*," the circuit court determined that the plain and ordinary meaning of this phrase refers to data that was "incorrect at the time the birth certificate was created." This interpretation is consistent with the above statutes, which state that birth certificates must record "the facts of birth." Thus, any amendments to correct such data must likewise relate to the facts existing at the time of birth.

[¶12.] As further noted by the circuit court, to the extent there is an ambiguity as to what the Department intended by this language in ARSD 44:09:05:02, the form promulgated by the Department for amending a birth certificate expressly requires the applicant to certify that the requested changes "are necessary to reflect the facts as they were at the time of birth[.]"[3] Therefore, the circuit court's interpretation of the rule aligns with the Department's expressed intention.

[¶13.] Nielsen's arguments to the contrary are misplaced. She cites the Black's Law Dictionary definitions of "incorrect" which refer to something that is

---

3. This form is located on the Department's website: https://doh.sd.gov/media/rekjrpxy/birth-record-amendment-request-form.pdf

"inaccurate," "improper," or "inappropriate," and argues that because she no longer presents or identifies as male, the sex designation on her birth certificate is incorrect. She thus claims that the rule allows such an amendment. However, the dispute over the interpretation of the phrase at issue here is not confined to the meaning of the word "incorrect." The more pertinent issue is centered on the point in time to which the term "incorrect" refers.

[¶14.]     On that issue, Nielsen argues that because the requirement in ARSD 44:09:05:02(2)(c) that a petitioner identify "the correct data as it should appear" is written in the present tense, the rule "seeks to clarify the current outward aspect of the data in question on the birth certificate." She maintains that if the rule were intended to limit amendments to reflect only what existed at or shortly after birth, the drafters would have referred to "the correct data as it *should have* appeared." But when considering the rule in its entirety, the circuit court's determination that the requirement in ARSD 44:09:05:02(2)(b) refers to an incorrect recording of the facts of birth is not inconsistent with the use of present tense in subsection (2)(c). If there is "incorrect" data listed on the certificate, the correction of that data will appear "as it should" going forward.

[¶15.]     Nielsen further asserts that because birth certificates can be amended to reflect name changes that occur after a birth, the administrative rule cannot be interpreted as allowing only amendments of information that was not accurately recorded at the time of birth. She argues that "there is no special signifier in the applicable statutes or regulations that differentiate between the name and gender data on birth certificates." However, there is such a differentiation.

[¶16.]     The Legislature has specifically enacted statutes that allow a new birth certificate to be issued in the case of a name change due to legitimation, an acknowledgement or determination of paternity, or an adoption. *See* SDCL 34-25-15 (allowing a new birth certificate after marriage of the parents, an affidavit acknowledging paternity, or a court order or affidavit determining paternity); SDCL 34-25-16.1 (allowing issuance of a new birth certificate after adoption). The administrative rules also allow amendments for changes of given names and surnames. *See* ARSD 44:09:05:05 (allowing amendments of given names); ARSD 44:09:05:12 (allowing amendments of surnames). South Dakota has no statutes or rules, however, allowing amendments to the sex designation on a birth certificate to reflect a later change in gender identity.

[¶17.]     Moreover, ARSD 44:09:05:04, the administrative rule regarding who may request an amendment, makes a distinction based on the particular type of information sought to be amended. ARSD 44:09:05:04 allows an amendment to a birth certificate upon a request by a registrant of legal age, a parent, a guardian, or the individual responsible for filing the certificate. But with respect to requested amendments of statistical data, the rule states: "Any item in the *statistical* portion of the birth certificate, however, may be amended only upon receipt of oral or written notification of *an error* from the person responsible for the completion of the items." *Id.* (emphasis added). The rule also states that "[a]ny item amended in the statistical portion of the birth certificate may not be marked amended." *Id.* While neither SDCL chapter 34-25 nor the administrative rules define "statistical data," logically, a sex designation would fall within this category, but a name change

would not. Therefore, contrary to Nielsen's claim, the circuit court's interpretation that ARSD 44:09:05:02 only allows for a correction of a sex designation that was erroneously recorded at the time of birth is consistent with the overall statutory and regulatory scheme. We conclude the circuit court did not err when so interpreting this rule.

> **2. Whether the circuit court's application of ARSD 44:09:05:02 to deny Nielsen's request for an amended birth certificate violates her equal protection rights.**

[¶18.] The Equal Protection Clause of the United States Constitution directs that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. South Dakota's Constitution similarly provides that "[n]o law shall be passed granting to any citizen, [or] class of citizens . . . privileges or immunities which upon the same terms shall not equally belong to all citizens[.]" S.D. Const. art. VI § 18.

[¶19.] Nielsen argues that the circuit court's application of South Dakota's administrative rules to preclude transgender individuals from amending their birth certificates to accurately reflect their current gender identity violates her equal protection rights. She argues that such application results in disparate treatment because she is not allowed to "have an accurate birth certificate because of her sex assigned at birth, while other similarly situated people can have an accurate birth certificate due to their sex assigned at birth." She cites cases from other courts that have found disparate treatment in violation of equal protection rights when laws or policies allow amendments to a child's name or birth parents, but do not allow transgender people to obtain a birth certificate that accurately reflects their gender

identity.  *See e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 935–36 (S.D. Ohio 2020); *F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020).  Nielsen further asserts that such rules warrant heightened scrutiny because transgender individuals are a quasi-suspect class.

[¶20.]        The United States Supreme Court recently considered a claim that Tennessee statutes restricting sex transition treatments for minors violated the equal protection rights of transgender minors.  *United States v. Skrmetti*, 605 U.S. 495 (2025).  While the legislation challenged in *Skrmetti* is different than the administrative rule at issue here, the manner in which the Court analyzed the equal protection claim in *Skrmetti* provides a helpful framework for our analysis.

[¶21.]        The issue in *Skrmetti* was whether the challenged legislation relied on sex-based classifications, thus warranting heightened scrutiny.  In considering this claim, the Court observed that the Fourteenth Amendment's Equal Protection Clause "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Id.* at 509 (citing *Romer v. Evans*, 517 U.S. 620, 631 (1996)).  The Court explained, when outlining the general analysis of equal protection challenges to legislative classifications, that "if a law neither burdens a fundamental right nor targets a suspect class, [the Court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* at 509–10 (quoting *Romer*, 517 U.S. at 631).  The Court noted that "[c]ertain legislative classifications . . . prompt heightened review," including sex-based classifications. *Id.* at 510.

[¶22.]     In *Skrmetti*, the legislation at issue prohibited healthcare providers from performing sex change surgeries on minors, and prohibited the prescribing, administering, or dispensing of puberty blockers or hormones "for the purpose of (1) '[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex,' or (2) '[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity.'" *Id.* at 506 (alterations in the original).  The Court noted that the law did not restrict the administration of puberty blockers or hormones to those over 18, nor does it fully ban the administration of such drugs to minors.  Instead, these drugs are allowed to treat congenital defects, early puberty, disease, or physical injury.  *Id.* at 507.  The Court thus held that the law did not classify based on sex, but rather on the basis of age and medical use.  *Id.* at 511.

[¶23.]     The Supreme Court also considered, and rejected, the plaintiffs' claim that the "*application* of [Tennessee's] law turns on sex." *Id.* at 512 (emphasis added).  The plaintiffs asserted the law prohibits certain treatments for minors of one sex that it would allow for a minor of the opposite sex, e.g., a female minor could not receive puberty blockers or testosterone to present as a male, but a minor whose biological sex is male, could receive these drugs.  In rejecting this claim, the Court noted that the law only restricts a specific "medical treatment" depending on "the underlying medical concern the treatment is intended to address." *Id.* at 513. The Court then gave examples of how such treatments may be sought by minors of the same sex and explained that the reason one may receive such treatment and the other may not, turns not on their sex, but instead on the condition for which they

are being treated. The Court thus concluded, "[t]he law does not prohibit conduct for one sex that it permits for the other. Under [Tennessee's law], *no* minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of *any* sex may be administered puberty blockers or hormones for other purposes." *Id.* at 514–15 (emphasis in original).

[¶24.] Additionally, the Supreme Court rejected the plaintiffs' further argument that the law "warrants heightened scrutiny because it discriminates against transgender individuals, who the plaintiffs assert constitute a quasi-suspect class." *Id.* at 517. The Court noted that it had not previously determined whether transgender individuals are a suspect or quasi-suspect class, but declined to address this question because Tennessee's law did not classify based on transgender status.[4] *Id.* The Court explained that the law does not preclude medical treatments based on transgender status, but "rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* at 518–19. The Court acknowledged that only transgender individuals comprise the group of minors seeking the excluded diagnoses, but because the group of minors that seek puberty blockers and hormones to treat other conditions could include both transgender and nontransgender individuals, it

---

4. Two of the concurring opinions in *Skrmetti* did undertake an analysis of whether transgender individuals constitute a suspect or quasi-suspect class requiring heightened scrutiny, and both concluded they do not. *See United States v. Skrmetti*, 605 U.S. 495, 548–49 (2025) (Barrett, J., concurring); *id.* at 565–66 (Alito, J., concurring). The three dissenting justices agreed that transgender status constitutes a quasi-suspect class. *Id.* at 600–01 (Sotomayor, J., dissenting).

determined "there is a 'lack of identity' between transgender status and the excluded medical diagnoses."[5]  *Id.* at 519.

[¶25.]	The Court in *Skrmetti* therefore applied a rational basis analysis, noting that statutory classifications will be upheld "so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *Id.* at 522 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)).  The Court further explained, "Where there exists 'plausible reasons' for the relevant governmental action, 'our inquiry is at an end.'"  *Id.* (quoting *Beach Communications*, 508 U.S. at 313–14).  In reviewing the relevant legislation, the Court found that the State's "age- and diagnosis-based classifications are plainly rationally related to . . . the State's objective[.]"  *Id.* at 522–23 (relating the concerns expressed by the Tennessee legislature regarding the ongoing debate among medical experts regarding risks of adverse medical and psychological consequences when such procedures are performed, or medications

---

5.	The plaintiffs in *Skrmetti* also argued that the Court should apply the same reasoning to their claim as the Court applied in *Bostock v. Clayton County*, 590 U.S. 644 (2020).  Nielsen also cites *Bostock* in her appellate brief as support for her equal protection claim.  *Bostock* involved a Title VII sex discrimination claim in which the Court applied a "but-for causation standard" to determine if changing one thing, i.e., the sex of the employee, would change the employer's action.  If so, then the firing of the employee was "because of" their sex and therefore unlawful.  *Id.* at 650–52.  The Court in *Bostock* held that "[f]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate . . . in part because of sex."  *Id.* at 662.  The majority opinion in *Skrmetti* declined to opine on whether *Bostock's* "reasoning reaches beyond the Title VII context," but nevertheless held that even if it did apply, neither sex nor transgender status altered the application of the Tennessee law.  *Skrmetti*, 605 U.S. at 520.

are administered, to minors). The Court thus concluded that the law did not violate the Equal Protection Clause. *Id.* at 525.

[¶26.] Although neither the Supreme Court nor this Court has addressed an equal protection claim from transgender individuals challenging the application of statutes, rules, or policies regarding requests to amend birth certificates to reflect an applicant's change in gender identity, this issue has been addressed by several federal circuit courts that have reached different outcomes.

[¶27.] The circuit court here relied in part on *Gore v. Lee*, an opinion from the Sixth Circuit Court of Appeals in which transgender females whose gender identity conflicted with the sex listed on their birth certificates sued Tennessee's governor and department of health commissioner, alleging that Tennessee's policy regarding birth certificate amendments violates their equal protection rights. 107 F.4th 548, 553–54 (6th Cir. 2024). The Tennessee statute and administrative regulation at issue are similar to ours. Tennessee allows amendments to birth certificates, but applicants must present evidence proving "that 'an original entry on a certificate was factually inaccurate at the time of recordation[.]'" *Id.* at 555 (quoting Tenn. Code Ann. § 68-3-203(f)). Tennessee's administrative rule mirrors the language in ARSD 44:09:05:02. *See* Tenn. Comp. R. & Regs. 1200-07-01-.10(2)(a)(1) (requiring an affidavit "setting forth . . . the incorrect data as it is listed on the certificate, and the correct data as it should appear"). Additionally, Tennessee has a provision that closely resembles ARSD 44:09:05:04. *See* Tenn. Comp. R. & Regs. 1200-07-01-.10(9) (stating that "[a]ll items in the medical certification or of a medical nature may be

amended only upon receipt of an affidavit from those persons responsible for the completion of such items").[6]

[¶28.]      In assessing the governing statute and regulations at issue in *Gore*, the court determined that Tennessee's policy "makes one relevant distinction" that "distinguishes between those applicants who produce evidence that the doctor erred in identifying their biological sex at birth and those who do not."  107 F.4th at 555. The court noted "[t]he distinction also treats the sexes identically" because "anyone may amend their certificate" upon a showing of evidence that "the certificate contains 'incorrect data.'"  *Id.* (quoting Tenn. Comp. R. & Regs. 1200-07-01-.10(2)(a)). The court observed that "[w]hen a law does not ascribe different benefits and burdens to the sexes, that law does not discriminate based on sex[.]"  *Id.* at 556. Here, the same conclusion can be drawn with respect to ARSD 44:09:05:02.

[¶29.]      The *Gore* plaintiffs advanced a similar argument to the one Nielsen makes—that if they had "been assigned female at birth, they would be able to have certificates matching their identity" and thus Tennessee's policy amounts to a form of sex discrimination.  *Id.*  The court of appeals rejected this argument, noting that "there is no fundamental right to a birth certificate recording gender identity instead of biological sex," and "absent an existing fundamental right, the Constitution does not require the States to embrace the plaintiffs' view of what information a birth certificate must record."  *Id.* at 557.

---

6.      Unlike South Dakota's statutory scheme, the Tennessee statute contains a provision stating that the "sex of an individual shall not be changed on the original birth certificate as a result of sex change surgery."  Tenn. Code Ann. § 68-3-203(d).

[¶30.]     The plaintiffs in *Gore* further argued that the "law discriminated based on transgender status" and thus requires heightened review. *Id.* at 558. The *Gore* court, citing its ruling in *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) (the opinion that was appealed to the United States Supreme Court), declined to recognize transgender status as a suspect class, and instead applied a rational basis review. *Id.* In doing so, the court noted it would "not question the 'wisdom, fairness, or logic' of Tennessee's chosen path, only whether it supports a legitimate government purpose." *Id.* at 560; *see also Skrmetti*, 605 U.S. at 524 (also recognizing this principle and noting that questions regarding policy should be left "to the people, their elected representatives, and the democratic process"). The court in *Gore* found several legitimate interests supporting Tennessee's amendment policy, including: the "tracking of the biological sex of infants at birth" which "aids the public health"; the collection of this information "to assist in preparing and publishing reports of vital statistics" which "help[s] state and federal officials to track important medical and sociological trends"; and the interest in maintaining a consistent definition of sex "based on physical identification at birth," which "protects the integrity and accuracy of Tennessee's vital records." *Gore,* 107 F.4th at 561 (citation modified). Here, the circuit court quoted *Gore* when noting that South Dakota's administrative rule is rationally related to these legitimate state interests.

[¶31.]     Other federal circuit courts have reached different conclusions, depending on the particular language and application of the statutes, rules, and policies at issue, when presented with similar equal protection claims as the one

raised in *Gore*. *See, e.g.*, *Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024) (holding that Oklahoma's executive policy directing its department of health to stop allowing amendments of sex designations on birth certificates constituted sex-based discrimination and violated the transgender plaintiffs' equal protection rights) *cert. granted, judgment vacated*, 145 S. Ct. 2840 (2025).

[¶32.]       When analyzing the equal protection claim in *Fowler*, the Tenth Circuit Court of Appeals noted that such a claim "must allege that the challenged state action purposefully discriminates based on class membership." *Id.* at 784. The court explained that purposeful discrimination can be shown in one of two ways: directly, by appearing on the "face of a state law or action," or circumstantially. *Id.* (citation omitted). If not facially discriminatory, the "court may infer purposeful discrimination from the 'totality of the relevant facts'" such as whether the policy "disparately impacts one group." *Id.* at 784 (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)). However, the court noted that "disparate impact 'is not the sole touchstone' of purposeful discrimination." *Id.* (citation omitted). The court noted that other touchstones include the "historical background" and "sequence of events leading to the challenged decision" as well as departures from normal procedures. *Id.* (citation omitted).

[¶33.]       As to Oklahoma's executive policy, the court, in *Fowler*, considered the plaintiffs' argument that the policy was facially discriminatory because "only transgender people are harmed by" it. *Id.* at 785. The court observed that because the policy does not allow anyone to amend the sex designation on a birth certificate, it appears facially neutral. The court then noted that disparate impact does not

alone show purposeful discrimination. *Id.* However, after considering the factual background and events leading to the policy, the court held that it purposefully discriminates against transgender individuals. *Id.* at 786 (noting that "[b]efore the Policy, cisgender and transgender people could obtain Oklahoma birth certificates that accurately reflected their gender identity" but after the policy was put into place, transgender individuals could "no longer obtain a birth certificate reflecting their gender identity").

[¶34.] The *Fowler* court also concluded the policy constitutes discrimination based on sex and, therefore, it did not have to determine if transgender individuals are a quasi-suspect class. *Id.* at 789 (citing *Bostock*, 590 U.S. at 660). The court then determined that because the policy did not survive rational basis review, it would likewise not withstand intermediate scrutiny. *Id.* at 795. Notably, however, the State of Oklahoma petitioned for certiorari review of the *Fowler* decision, and the petition was granted. The United States Supreme Court vacated the *Fowler* judgment and remanded for further consideration in light of the Court's decision in *Skrmetti*. *See Stitt v. Fowler*, 145 S. Ct. 2840 (2025).

[¶35.] Given this direction by the Supreme Court when vacating the *Fowler* judgment, we adhere to the general principles set forth in *Skrmetti* when analyzing Nielsen's equal protection claim here. As a starting premise, we note that South Dakota's administrative rule allowing amendments to birth certificates makes no mention of sex or transgender status. *See* ARSD 44:09:05:02. In fact, it places no limitation on who can amend the data on a birth certificate. Therefore, on its face, it clearly does not classify based on sex or transgender status. It simply limits the

type of amendments that can be made to corrections of "incorrect data as it is listed on the certificate." *Id.*

[¶36.]     As to Nielsen's as-applied challenge, we note that while other rules and statutes specifically allow for changes to given names and surnames via an amendment or by issuing a new birth certificate depending on the particular scenario, South Dakota has no rule or statute allowing a sex designation that was *correctly* recorded at the time of birth to be changed via an amendment. While our Legislature could enact such a provision, it has not done so, and Nielsen has not cited any binding or persuasive authority suggesting that there is a fundamental right to have the ability to change the sex designation recorded on one's birth certificate.

[¶37.]     To the extent that the *lack* of statutes and rules allowing such amendments disparately impacts transgender individuals, this alone does not constitute *purposeful* discrimination. *See Washington*, 426 U.S. at 242 (holding that disparate impact, standing alone, is not enough to show purposeful discrimination). Notably, Nielsen has not alleged that the enactment of ARSD 44:09:05:02 was motivated by "an invidious discriminatory purpose." *See Brandt ex rel. Brandt v. Griffin*, 147 F.4th 867, 880 (8th Cir. 2025) (citing *Skrmetti*, 605 U.S. at 516).

[¶38.]     Because the Department's administrative rules relating to birth certificate amendments do not classify or purposefully discriminate on the basis of sex or transgender status, we need not determine whether transgender individuals constitute a quasi-suspect class warranting a heightened standard of review. *See Skrmetti*, 605 U.S. at 517 (similarly determining that the case does not raise the

question whether transgender individuals are a suspect or quasi-suspect class because the legislation at issue does not classify on this basis); *see also Dorian v. Johnson*, 297 N.W.2d 175, 178 (S.D. 1980) (declining to address whether a heightened standard of review applies after finding no arbitrary classification relating to the then-existing rules pertaining to the issuance of new birth certificates for illegitimate children after an acknowledgement of paternity).  Absent a deprivation of a fundamental right or a classification based on a suspect class, the challenged administrative rule need only withstand a rational basis review.

[¶39.]     The Department maintains that there is a rational relationship between the correct designation of sex at birth on a birth certificate and a legitimate government purpose.  It notes that the "state has spent years tracking large amounts of data points at the date of birth."  Not only does the Department track the data on certificates, it also publishes the "statistical data derived from such records."  SDCL 34-25-1.1(15) (defining the "System of vital registration" as "the process by which vital records are collected, completed, amended, certified, filed, preserved, and incorporated into the official records of the office of vital records, and activities related thereto including the tabulation, analysis, and publication of statistical data derived from such records.").  Thus, there is a rational relationship between a rule that only allows an amendment to statistical data to reflect an error at the time of birth and the State's legitimate interest in maintaining accurate vital records from which the data therein can be properly analyzed and published.

[¶40.]     For all the above reasons, we conclude that Nielsen has not established that ARSD 44:09:05:02 violates her equal protection rights, either on its face or by

its application to her request. We therefore affirm the circuit court's denial of Nielsen's request to amend the sex designation on her birth certificate.

[¶41.] Affirmed.

[¶42.] MYREN, Justice, and KERN, Retired Justice, concur.

[¶43.] JENSEN, Chief Justice, and SALTER, Justice, concur specially.

[¶44.] GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

SALTER, Justice (concurring specially).

[¶45.] I join the Court's opinion in full and note somewhat parenthetically the potential incongruity between Nielsen's assertion of incorrect data based upon gender with the fact that Nielsen's birth certificate recorded sex, not gender. For many people, there is a difference, as Justice Alito noted in his concurring opinion in *Skrmetti*. *See United States v. Skrmetti*, 605 U.S. 495, 559 (2025). For instance, "gender identity" could mean "a person's internal sense of being male, female, some combination of male and female, or neither male nor female." *Gender Identity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/gender%20identity (last visited Feb. 26, 2026).

[¶46.] The term "sex," on the other hand, may refer to a person's biological sex, as is the case with several statutes that exist outside the specific context of birth certificates. *See, e.g.*, SDCL 34-24-33 (defining "sex" within Chapter 34-24 dealing with children's health as "the biological indication of male and female, as evidenced by sex chromosomes, naturally occurring sex hormones, gonads, and nonambiguous internal and external genitalia present at birth"). Viewed in this

way, Nielsen's petition seems less an effort to correct data under ARSD 44:09:05:02 and more an attempt to expand the type of data recorded on a birth certificate or perhaps even the definition of sex, both of which are topics better left to the Legislature.

[¶47.]        JENSEN, Chief Justice, joins this writing.